JOHN D. KILPATRICK ET AL., APPELLEES, V. KANSAS CITY & BEATRICE RAILROAD COMPANY ET AL., APPELLEES, IMPLEADED WITH NEW YORK SECURITY & TRUST COMPANY, APPELLANT, AND E. P. REYNOLDS & COMPANY, INTERVENORS.

FILED JANUARY 3, 1894. No. 5034.

1. **Mechanics' Liens:** MORTGAGES: PRIORITIES., Between an investment company and certain individuals it was agreed that the former should furnish, substantially, all the money necessary for, and to be used in, the construction of a proposed railroad and take their notes therefor, their payment to be guarantied by an existing railroad company, controlled by such individuals; that they should execute and file a certificate of incorporation of the proposed railroad, and execute, or cause to be executed, in its name, a mortgage on its anticipated property to secure its negotiable bonds, to be issued by it and deposited with the investment company as collateral security for said notes. At the date of the execution and delivery of such bonds and mortgage, pursuant to said agreement, and at the date of the record of such mortgage, such proposed railroad company had acquired no property, right of way, or franchises, and had taken no step towards the acquisition of either, further than the filing of its certificate of incorporation and the naming of its board of directors and officers, of all which facts the investment company had knowledge. The money agreed to be furnished by the investment company was by it paid over to the individuals afore-

said, they then being officers of the proposed railroad company, to be by them expended in the construction of said proposed railroad; and such individuals entered into contracts in the name of such railroad company for labor and material used in the building of its said road, but failed to pay therefor. *Held,* That the investment company should be regarded as a promoter and builder of the railroad, and was not entitled to have the mortgage decreed a lien upon the property and franchises of the railroad constructed, superior to the statutory liens against the same for labor and material furnished in its construction. Post, J., with Ryan and Irvine, CC., dissenting.

2. A waiver of a mechanic's lien will not be inferred merely from the taking of collateral security from another, and in a manner not inconsistent with the retention of the lien.

3. A former adjudication in the federal courts on the subject-matter of a controversy cannot be taken notice of in the state courts unless properly presented by the pleadings and proofs.

Appeal from the district court of Gage county. Heard below before Appelget, J.

*Hornblower, Byrne & Taylor, Warner, Dean & Hagerman,* and *Griggs & Rinaker,* for appellant.

*Harwood, Ames & Kelly, I. P. Dana,* and *R. S. Bibb,* for appellees.

*Marquett, Deweese & Hall,* for intervenors.

See opinions for authorities upon the propositions discussed.

Ragan, C.

This is an appeal from a decree of the district court of Gage county, rendered July 17, 1891. The action was brought by the appellees, Kilpatrick Bros. & Collins, to foreclose a mechanic's lien against the property of the Kansas City & Beatrice Railroad Company (hereinafter called the "Beatrice Company") for a balance due for labor and material furnished in the grading of that company's rail-

road.   The appellant, The New York Security & Trust
Company (hereinafter called the "Trust Company"), was
made a party defendant, as it held a mortgage on the road
of the Beatrice Company, given by it to secure an issue of
$400,000 of its negotiable bonds.   The appellee, The Kan-
sas City, Fort Scott & Memphis Railroad Company (here-
inafter called the "Fort Scott Company"), was also made a
party and filed its answer, claiming a lien for a balance due
it for ties sold and delivered to the Beatrice Company, and
used in the construction of its road.   The appellee, The
Kansas City, Wyandotte & Northwestern Railroad Com-
pany (hereinafter called the "Wyandotte Company"), was
made a party defendant, as it was in the possession as les-
see of the road of the Beatrice Company.   By the decree
of the district court Kilpatrick Bros. & Collins were
given a lien upon the property in question for the sum of
$29,445.17; and the Fort Scott Company was given a lien
for the sum of $33,864.79.   The two were declared first
liens of equal rank and to prorate one with the other.
The Trust Company, by the decree, was also given a lien
on the property, subject to the first two liens, for the sum
of $278,267.85.   The decree also provided that in case of
default in the payment of these amounts within a time
fixed, the property and franchises of the Beatrice Company
should be sold and the proceeds of the sale applied to the
satisfaction of the liens in the order of their priority.   The
Trust Company brings the case here and avers that the
decree is erroneous, in the fact that its lien is postponed to
those of the Kilpatrick Bros. & Collins and the Fort Scott
Company.

It is conceded that the value of the property in contro-
versy is insufficient to pay the amount of all the liens ad-
judged against it.   The facts disclosed by the record before
us, so far as they are deemed material, are these : That some
time prior to the 29th day of May, 1889, the Wyandotte
Company, a foreign corporation, had constructed a line of

railroad from Kansas City, Missouri, to the line between
the state of Kansas and the state of Nebraska, at a point
called Summerfield. For the prosecution of this undertak-
ing, money had been furnished by the Philadelphia Invest-
ment Company (hereinafter called the "Investment Com-
pany"), a Pennsylvania corporation, having its place of
business in the city of Philadelphia, in said state, upon
terms and security which are not disclosed by the record,
and which are immaterial except as showing that the In-
vestment Company was familiar with the affairs of the
Wyandotte Company, which shortly thereafter proved to
be insolvent, and was, at the date of the negotiations here-
inafter mentioned, financially unable to carry out an enter-
prise involving an outlay of considerable sums of money.
Previous to this time, however, and during the progress
of the construction of the road of the Wyandotte Company,
and probably as a part of that undertaking, it was pro-
posed to extend this line of road to Beatrice, Nebraska.
At the time this project was first undertaken, it was sup-
posed and intended that this extension would be made in
the name and under the authority of the Wyandotte Com-
pany. Subsequently, however, pursuant to correspondence
between one Erb, the president of the Wyandotte Company,
and one Brockie, the president of the Investment Company,
the plan was so changed as to require the formation of a
Nebraska corporation, and accordingly a certificate of in-
corporation of the Beatrice Company was executed and re-
corded on the 19th day of June, 1889. On the first day
of July, 1889, a mortgage was executed by the Beatrice
Company upon all its property and franchises then existing,
or thereafter to be acquired, purporting to be given to se-
cure its negotiable bonds to the amount of $400,000. This
mortgage, which was filed for record on the 13th day of
July, 1889, contained, among other things, the following:

"Whereas, the said party of the first part is the owner
of a line of railroad constructed, and in process of construc-

tion, from a point on the line of the Kansas City, Wyandotte & Northwestern railroad where the same intersects the state line between Kansas and Nebraska, thence extending in a northerly direction through Pawnee county, state of Nebraska, to the city of Beatrice, in Gage county, in said state, all of said line of railroad being of the estimated length in the aggregate of thirty-five miles, or thereabouts; * * *

"Whereas, for the purpose of building, furnishing, equipping, and operating said railroad, the party of the first part is desirous of borrowing money and has resolved to execute bonds of said company in amounts of $500 each, as hereinafter stated: * * * Upon the execution and delivery of this mortgage, and from time to time thereunder, the trustee shall, as requested by resolution of the board of directors of the railroad company, certify the bonds hereunder to the extent of and not exceeding $400,000, and on said resolutions of said board of directors shall sell all bonds requested to be certified, and their proceeds shall actually be used for and applied, under the direction of said board, to the construction, completion, maintenance, and operation of said railroad, and not otherwise."

On the 17th day of July, 1889, all these bonds were delivered to the Investment Company under an agreement as finally perfected, that the latter company should advance, from time to time, to the Wyandotte Company, or to Erb, as its president, money for the construction of the proposed Beatrice Company, upon the notes of the Beatrice Company, guarantied by the Wyandotte Company, for the payments of which these bonds should be held as collateral security. The entire amount of the capital stock of the Beatrice Company was subscribed by and issued to the Wyandotte Company; but it is evident that nothing was ever paid or intended to be paid therefor. During the earlier weeks of these negotiations, and until about the time of the execution of the bonds and mortgage, it had

not been decided whether a Nebraska corporation should be formed or not; nor if so, what should be its name; nor had the right of way been secured, or the route, or the Nebraska terminus of the road determined upon.

Elias Summerfield, the treasurer and general manager of the Wyandotte Company, testified on the trial as follows:

Q. Was there a note for this money?

A. Yes, sir.

Q. Who executed it?

A. It was first executed by the Kansas City & Northwestern road. Afterwards the attorney of the Trust Company suggested that it had better be changed, and returned the note to us to be executed by the Kansas City & Beatrice road, and indorsed by the Kansas City, Wyandotte & Northwestern road, and by the Northwestern Construction Company.

Q. When was that exchange made?

A. I can't tell you now. It was after the first note was signed, and we had gotten some of the money on it.

Q. Was it as late as October?

A. I can't remember. I possibly might find out at my office.

Q. But the original notes were made by the Kansas City, Wyandotte & Northwestern Railroad Company, and indorsed by the Construction Company?

A. Yes sir. We hadn't even incorporated the Kansas City & Beatrice road.

Q. It hadn't been incorporated?

A. No, sir; I think not, when the arrangement was made for the loan.

Q. The money was borrowed by the Kansas City, Wyandotte & Northwestern road, and placed in its treasury?

A. The exchange of notes was made before we got all the money. We might have got one payment, or the second, I can't tell which.

44

Q. Did you have a treasurer for the Kansas City & Beatrice road?

A. Yes, sir, a nominal one.

Q. But none of this money went into his hands?

A. No, sir.

Q. And these bonds of the Kansas City & Beatrice road were placed as collateral, after issued, to these notes?

A. Yes, sir.

Q. Do you know when the bonds were issued, as a matter of fact?

A. I think it was some time after we got the first issue, —the first $65,000.

Q. After that?

A. Yes, sir.

Q. How long after?

A. I think some time after the latter part of July, 1889; I am not sure.

Q. At the time these first notes were executed, what, if anything, had been done by the Kansas City & Beatrice road towards the organization for the building of such road?

A. Nothing at all.

Q. Had the grade stakes been set?

A. No, sir; we had not even concluded on the final location at that time, nor even the name of the road.

Q. And the right of way had not been procured?

A. No, sir.

Q. So that nothing, in fact, had been done at the time you executed these first notes and got the first money?

A. I think not. Of course we had made preliminary surveys.

Q. But had not established your lines?

A. We had not done anything until the 8th day of August, 1889, the date of the vote for municipal bonds was had at Beatrice. If we hadn't gotten the bonds we would not have built. We intended going to Wymore. * * *

Q. Are you able to state approximately the amount of actual cash you received from the Philadelphia Investment

Company or from the Wyandotte & Northwestern Company?

A. I think something about $250,000. There was about three per cent commission paid for the loan.

Q. Money was constantly taken out for interest on these notes from month to month?

A. No, sir, they were not due. The road went into the hands of a receiver before the notes became due, I think; that is my impression. We might have made one payment of interest, I am not sure—I expect we did; I think we paid the interest on the six months installment; I have forgotten about that.

It was estimated that the proposed construction would cost $350, 000. Of this sum $260,000 was to be furnished by the Investment Company upon the notes of the Wyandotte Company, afterwards changed to the notes of the Beatrice Company, guarantied by the Wyandotte Company, and collaterally secured by the bonds of the Beatrice Company, to the amount of $400,000, secured by a mortgage on its anticipated property. These bonds, when executed, were to be placed in the possession of the Investment Company. Sixty-five thousand dollars of the cost of the proposed road was expected to be realized from municipal donations, and any deficiency was to be made up from the treasury of the Wyandotte Company. The success of the enterprise depended upon the co-operation of the Investment Company, and its officers and attorneys were consulted at every step in the organization and progress of the enterprise. Pursuant to this arrangement money was furnished from time to time by the Investment Company to Erb and his associates, which it was intended by the Investment Company should be used in the building of the road. However, the Investment Company does not know how much thereof was in fact so employed, nor how much, if any, was diverted to other purposes. Erb and his associates proceeded to make contracts, as officers of and in the name of

the Beatrice Company, for work and material for the con-
struction of the road of that corporation, and, among
others, entered into a contract with Kilpatrick Bros. &
Collins for grading, and with the Fort Scott Company
for ties. The parties thus contracted with fulfilled their
respective obligations, performing the labor and furnishing
the material contemplated, until the 8th day of January,
1890, when the same was completed. For the balance re-
maining unpaid on both their accounts notice of liens
against the property of the Beatrice Company was duly
filed. It is not denied that all of the bonds, together with
the notes for which they were deposited as collateral, remain
in the possession of the Investment Company.

The important and controlling question in this case is
whether the liens of the men who furnished the material
and labor that entered into the construction of this rail-
road are superior to the lien of this mortgage made thereon
before the road had any existence, except on paper, and
made for the benefit of the Investment Company, which
knew, at the time of its execution, that the property which
it purported to cover had in fact no existence. The statute
relative to mechanics', material-men's, and contractors'
liens upon property of this character is found in chapter
54, article 2, Compiled Statutes, 1893, sections 2 and 3 of
which are as follows:

" Sec. 2. And when material shall have been furnished,
or labor performed, in the construction, repair, and equip-
ment of any railroad, canal, bridge, viaduct, or other
similar improvement, such labor and material-man, con-
tractor or subcontractor, shall have a lien therefor, and the
said lien therefor shall extend and attach to the erections,
excavations, embankments, bridges, road-bed, and all land
upon which the same may be situated, including the rolling
stock thereto appertaining and belonging, all of which, in-
cluding the right of way, shall constitute the excavation,
erection or improvement provided for and mentioned in
this act.

"Sec. 3. Every person, whether contractor or subcontractor, or laborer or material-man, who wishes to avail himself of the provisions of the foregoing section shall file with the clerk of the county in which the building, erection, excavation, or other similar improvement to be charged with the lien is situated, a just and true statement or account of the demand due him after allowing all credits, setting forth the time when such material was furnished or labor performed, and when completed, and containing a correct description of the property to be charged with the lien and verified by affidavit; such verified statement or account must be filed by a principal contractor within ninety days, and by a subcontractor within sixty days, from the date on which the last of the material shall have been furnished, or the last of the labor is performed; but a failure or omission to file the same within the periods last aforesaid shall not defeat the lien, except against purchasers or incumbrances in good faith without notice, whose rights accrued after the thirty or ninety days, as the case may be, and before any claims for the lien was filed."

It is urged that this statute is not unlike other enactments of the same general character, in that it entitles the contractor, laborer, or material-man to a lien only upon the interest of the party or parties at whose instance the work may be done or material furnished; and that, therefore, if at the time the work of the construction or reparation is begun the property is subject to existing liens shown on the public records, such liens will be entitled to precedence over any claim that may be asserted for labor or material furnished for improvements on the property after the date of the filing of said liens; and it is argued, therefore, that the appellant is entitled to a first lien upon the property in question for the amount of the advances made by the Investment Company to Erb and his associates, because the mortgage of the Beatrice Company was executed and filed for record at a date prior to that at which the

contracts for labor and material were entered into. To sustain this contention the learned counsel for the appellant cite many authorities. Of the authorities so cited, the one most relied upon, perhaps, is *Toledo, D. & B. R. Co. v. Hamilton*, 134 U. S., 296, in which it is said: "A recorded mortgage, given by a railroad company on its road-bed and other property, creates a lien whose priority cannot be displaced thereafter, either directly by a mortgage given by the company, or indirectly by a contract between the company and a third party for the erection of buildings or other works of original construction." It appears from the reported opinion in this case that January 17, 1880, the railroad company executed a mortgage on this property to the Central Trust Company of New York to secure the payment of $1,250,000 of six per cent bonds. The mortgage was to cover all the property then owned or that might thereafter be acquired by the railroad company. The trust company accepted the trust created by the mortgage and the railroad company issued its bonds. They were certified by the trust company and sold on the market. On March 20, 1883, Hamilton entered into a contract with the company, under and by which he furnished material and erected for the company a dock on the Maumee river, and having received only a partial payment, he filed a claim for a mechanic's lien for the balance due him. The land on which the dock was built was a part of the railroad and covered by the mortgage made to the Central Trust Company. Brewer, justice, speaking for the supreme court of the United states, said: "It will be noticed, and it is a fact which lies at the foundation of this case, that the contracts for the construction of the dock were not made till more than three years after the execution and record of the mortgage. The record imparted notice to Hamilton and to all others of the fact and terms of the mortgage; and the question is thus presented, whether a railroad company, mortgagor, can, three years after creating by a recorded

mortgage an express lien upon its property, by contract with a third party, displace the priority of the mortgage lien. It would seem that the question admits of but a single answer. Certainly as to ordinary real estate no one would have the hardihood to contend that it could be done, and there is in this respect no difference between ordinary real estate and railroad property. A recorded mortgage, given by a railroad company on its road-bed and other property, creates a lien whose priority cannot be displaced thereafter, directly by a mortgage given by the company, nor indirectly by a contract between the company and a third party for the erection of buildings or other works of original construction."

By the judgment of the court pronounced in that case Hamilton's lien was held to be subject to the lien of the mortgage executed by the railroad company in January, 1880. But in that case the railroad company had a real franchise. It owned, and had owned for some time, the lands upon which the docks were built. The mortgage had been of record on a railroad in existence for some years prior to the performance of this work by Hamilton.

In our opinion, the principles of law announced by the supreme court of the United States in that case are inapplicable to the facts disclosed by the record in the case we have under consideration. When the mortgage of the Beatrice Company was executed, that company had, at most, but a nominal existence and nothing whatever upon which a mortgage or other conveyance could operate. Property or property rights it did not have; but it is said that it had a franchise, and that this could be mortgaged, and that the mortgaging of it, together with the after-acquired property, drew with it the subsequently constructed road and appurtenances. How can it be said with any degree of accuracy that the Beatrice Company, at the time of the execution of this mortgage, was possessed of a franchise? At that time nothing had been done, or certainly determined upon, in its

behalf, excepting the mere execution and filing of its cer-
tificate of incorporation.    No map of its proposed line of
road had been filed or prepared.    No right of way had
been procured, nor steps been taken towards its acquisition;
nor had the proposed route or Nebraska terminus of the
road been determined upon, further than if the road should
be built at all, which was a matter still in abeyance and
dependent upon certain contingencies, it would extend
through and into certain counties.    It is quite certain at
least, prior to the location of the line of the proposed road
and the procurement of its right of way, either actually or
by the beginning of proceedings therefor, under the statu-
tory enactments for such purposes, any other five persons
might have filed a like certificate of incorporation, and if
possessed of the inclination and necessary pecuniary ability,
might have constructed, maintained, and operated the very
line of road now in controversy.

A franchise which not only imposes upon its possessor
no obligation, but confers upon him no right or privilege
not enjoyed by every other person, is so singular as to defy
classification.    Mankind are prone to mistake words for
things, and are often pardonable for the fault; but it is dif-
ficult to form a sufficient excuse when there is nothing in
existence for which the word is in any sense descriptive.
Be that as it may, it is evident from the facts disclosed in
this record that the Beatrice Company never had, or was
intended to have, either by the Investment Company or by
Erb and his associates, any beneficial interest in or control
over its franchise or property, at least not until after the
building and equipment of the line.    The controlling mo-
tive and intent of the parties, and the sole purpose from the
inception of the scheme, was not that the Beatrice Com-
pany should build the road, borrowing such sums as in ad-
dition to its own means should be necessary, but that the
Investment Company should construct the road through
the instrumentality of the Wyandotte Company and Erb

and his associates, as its agents, retain at all times, by means of the bonds and mortgage, the practical possession and control of its franchise, property, and revenues. Doubtless, it was hoped by the Beatrice stockholders and incorporators that something would be realized in the way of dividends, or otherwise, over and above what would be required for the satisfaction of the principal and interest of the advances made by the Investment Company; and this sum, whether great or small, would accrue to them upon the sale of the Beatrice road, or otherwise, as a compensation for their participation in the undertaking. But they embarked nothing in the venture, and cannot, with any propriety, be said to have had any interest in its success, except the contingent and speculative one just mentioned. Practically, the Investment Company undertook to construct the railroad of the Beatrice Company, furnishing the requisite means therefor, and employing Erb and his associates, as its agents, to effect a technical organization, procure such municipal donations as were obtainable, look after and make the requisite contracts for the procurement of the material and construction of the road; see to the disbursement of the money, they assuming no personal obligation or responsibility in the matter, and accepting as compensation for their services such profits, if any, as should be realized out of the speculation. To regard such a transaction in the same light as that of the erection of a building by a mortgagor upon mortgaged lands for which he retains the title, is, it seems to us, false reasoning.

It is urged with much force by counsel for the appellant that the record of the mortgage was constructive notice to persons dealing with the railroad, of the rights of the mortgagee. True, but that is the extent of its effect. The recording of the mortgage created no rights or obligations. Under the circumstances of this case, the facts that the bonds which the mortgage purported to secure were negotiable is of no significance. The rights of the parties and

the legal effect of the transaction would be precisely the same had no such bonds been executed or contemplated, and had the mortgage recited at length the transactions and agreements between the Investment Company and Erb and his associates, and simply pledged the proposed road and franchise to the Investment Company as security for its advances for the construction of the road.   Had the mortgage contained such a recital, no one would doubt, it seems to us, that the Investment Company was the real promoter and builder of this road, and that Erb and his associates, and the officers of the Beatrice Company were in reality, though not nominally, the Investment Company's agents, and that the contracts and obligations incurred by them, even in their own names, in and about the construction of this road, would be binding upon the Investment Company.

It is admitted by counsel for the appellant that if the bonds had remained in the hands of Erb or the Wyandotte Company into whose possession they first came, the mortgage would not have been entitled to priority over the mechanic's lien claimants, and we are unable to see that anything subsequently occurred which improves the status of these bonds.   What recourse or remedy, if any, the lien holders would have had if the bonds had been sold to innocent purchasers, or whether prior to the completion of the road and filing of the liens there could have been any such purchasers, we are not called upon to determine.

Another case relied upon by counsel for the appellant is *Porter v. Pittsburg Bessemer Steel Co.*, 120 U. S., 649.   The syllabus of that case is as follows: "In this case unsecured floating debts, due by a railroad company for construction, were, in the absence of a statutory provision, held not to be a lien on the railroad superior to the lien of a valid mortgage on it, duly recorded, and of bonds secured thereby, and held by *bona fide* purchasers for value."   It will be seen from an examination of the opinion in that

case that it differs from the one at bar in many important particulars. There the railroad company, at the time of the execution of the mortgage, owned, not only its franchises, but the road-bed and right of way and township aid voted for the construction of the road; and the bonds which the mortgage was intended to secure were delivered by the railroad company to one Crawford in consideration of his agreement to construct the road, and he, and not the company, negotiated and pledged the bonds for money with which to perform his contract; and the lien claimants contracted, not with the railroad company, but with Crawford, with actual knowledge of the existence of the mortgage and of the consideration upon which the bonds were delivered to Crawford, and of the fact that they were negotiated by him, and that the proceeds belonged to him and were being expended in the fulfillment of his contract. Of course the fact that the parties to whom he sold the bonds took precautions to have the proceeds actually expended in the construction, could not have the effect, equitably or otherwise, to postpone the lien of the mortgagee to that of the other persons, who, with full knowledge of all the circumstances, were selling Crawford material for use under his contract, for the railroad company, for the procurement of which, on his part, he had been paid by the very securities which they sought to have deferred for their benefit.

A case very much like the one at bar is the *Farmers Loan & Trust Co. v. Canada & St. L. R. Co.*, 26 N. E. Rep. [Ind.], 784, where it is said: "The remaining question may be thus stated: Is the lien of the appellant's mortgage superior to the liens of the appellees? In order to intelligently discuss this question it is necessary to state the material facts out of which it arises. Those facts may be thus summarized: On the 28th day of May, 1888, the railway company entered into a contract with the Burns Construction Company to build and equip its road. Burns

was the president of the railway company, and also the general manager of the construction company. On the 28th of August, 1888, the railway company ordered the execution of a trust deed, and the instrument was written and signed in duplicate. One of the duplicates was delivered by Burns to the Farmers Loan & Trust Company on the 18th day of October, 1888. The other was retained by the railway company. The bonds which the trust deed was executed to secure were retained by the company that executed the mortgage; but from time to time bonds were delivered to Burns upon estimates issued to him by the railway company's engineer. Ten of the bonds were transferred to William Dallin, and sixty-six were transferred to John Fitzgerald, a subcontractor. The remainder of the bonds, three hundred and sixty-four in number, were hypothecated by the Burns Construction Company, but when, where, to whom, or for how much, is not shown. In considering the question of priority, one of the important things to be kept in mind is that the mortgage was executed upon property that had, in fact, no existence, for the railroad mortgaged had not been built. That there is a material difference between a case such as this, where the railroad had not been built, and a case where the railroad has been constructed, is so evident that no one can fail to perceive it the instant his attention is directed to the matter. As held in *Brooks v. Railway Co.*, 101 U. S., 443, parties must in such a case as this be deemed to have contracted with reference to the existing condition of things so far as they were open to observation. The mortgagee must have known that its security was valueless as long as there was no road in existence, and it must have known also that labor, material, and money would be required to build the road. It was bound to know, too, what the law was, for 'it entered into and became a part of their contract.' This general rule has been repeatedly declared and enforced by this court. The principle we are discussing was ap-

plied to the case of a lien asserted by a miner, and it was held that the lien was superior to a mortgage. But the present case is much stronger than the one referred to, for here there was in fact no property in existence when the mortgage was made. The property upon which the mortgage finally fastened was created by the labor, materials, and the money of the appellees. We are strongly inclined to doubt whether the mortgage lien would be paramount even if the bonds which the mortgage was executed to secure had been delivered before any notices of liens were filed. Very strongly reasoned decisions declare that the liens of the mechanics are superior to the lien of the mortgage in cases where the mortgage is executed before the construction of the railroad. (*Neilson v. Iowa E. R. Co.*, 44 Ia., 71; *Equitable Life Ins. Co. v. Slye*, 45 Ia., 615) We need not, however, decide this question, but it is proper to say that as the labor, materials, and money of the appellees gave all there is of value to the property claimed under the mortgage, the mortgagee ought to show a clear and strong superior right in order to defeat the claims of those who, in reality, brought the property into existence. The doubt in our minds is whether the mortgagee's lien can, in any event, be justly held to be the prior one. We have no doubt that if the mortgagee can succeed at all it must be because it is shown clearly and strongly that the mortgagee is a *bona fide* purchaser. In our judgment the appellant has shown no such right as entitles it to the paramount lien. It is true that the trust deed or mortgage was placed in the hands of the mortgagee or trustee before some of the notices were filed, but the instrument securing the bond was a mere shadow; for had no bonds ever been delivered to *bona fide* holders the instrument would never have been effective against these lien holders. We are far within the authorities in asserting this, as they carry the doctrine much further.    *   *   *

"The delivery of the mortgage or trust deed alone did

not destroy the priority of the liens of the appellees, for the delivery of such an instrument cannot of itself defeat equitable or legal claims, since it is essential that one who asserts a right against a legal or equitable claim should show that he parted with value before notice of such equitable or legal right. (*Anderson v. Hubble,* 93 Ind., 570, and cases cited; *Hunsinger v. Hofer,* 110 Ind., 390, 11 N. E. Rep., 463.)   This is the rule in ordinary cases, and certainly it must govern a case like this, where the mortgagee seeks to defeat the claims of those whose labor, materials, and money created the property which it is sought to subject to the lien of the mortgage.   The mortgagee must succeed, if at all, as a *bona fide* holder of bonds executed under the mortgage.   It cannot, as against the claims of the laborers, mechanics, and material-men, be deemed a *bona fide* holder unless it affirmatively shows that it paid value for the bonds before notice of the liens.   The rule in analogous cases is well settled in this state, and the strong equities of the appellees call for its liberal application in this instance. *   *   *   There is reason for saying that it was the duty of the party buying the bonds to ascertain whether a lien had been placed on the property prior to the time of its acquisition of those instruments, but we do not go as far as that in this case.   *   *   *   We are not here seeking a general rule that shall apply to every case resembling the present, nor do we attempt to lay down any such rule. We simply adjudge that in such a case as this the mortgagee cannot prevail over laborers and material-men without showing that it is a *bona fide* holder of the principal debt in all that the term '*bona fide* holder' implies.   It cannot, in a case like this, where there was no railroad in existence when the mortgage was delivered, be deemed a *bona fide* holder as against laborers, mechanics, and material-men without showing that before notice of the acquisition of the liens under the statute a fair value was paid for the bonds."

We concur in both the reasoning and the conclusion of the foregoing opinion. It is not to be denied that the supreme court of the United States distinguishes between the rolling stock and chattels of a railroad company, which it characterizes as "loose property susceptible of separate ownership and separate liens," and the road-bed, station houses, tracks, etc., and upon this distinction holds that while the doctrine as to the after-acquired property applies to the former it does not apply to the latter. The basis of this distinction is the doctrine relative to fixtures to real property. It is not denied that if one owns real estate which is subject to a valid mortgage or other lien, and another sells him personal property which he permits to be affixed to or incorporated into the real estate, he, by so doing, waives any right he might otherwise have to claim a lien for the purchase price superior to the prior mortgage; and this arises out of the necessity of the case, because, otherwise, the mortgagee might be deprived of his security by the depreciation of values or by extravagant or exorbitant improvements without his knowledge or consent. But how can this be the case when a mortgage is made and the money advanced upon it for the sole purpose of bringing into existence the entire property upon which the mortgage is intended to rest? The case at bar is a good illustration. The Investment Company knew that its bonds and mortgage were, and would remain, of no value unless the railroad should be constructed; it knew that in order that such a road should be constructed that material and labor were indispensable, and that the Nebraska statute guaranties a lien to those who should furnish them. The Investment Company made Erb and the Wyandotte Company its agents for the purposes of this construction, and it owed the duty to persons furnishing material and labor in the building of this railroad to see that the money advanced was applied to the payment of their claims.

Another point made by the appellant is that Kilpatrick Bros. & Collins, by their conduct, have waived their rights to a lien. It appears that after the completion of the work, one Strohm, who was their accountant and book-keeper, together with Erb, the president of both railroad companies, made a computation and agreement as to the amount remaining unpaid under the contract, and received from the latter accepted drafts upon the Wyandotte Company for that amount; but he testified, without contradiction, that it was expressly agreed that these drafts were not taken or to be considered as payment, but only as collateral security therefor, and as constituting a record of the computation and accord; and that there was no agreement for the relinquishment of any existing or prior obligation in favor of his principals, and that no such release was intended by him, nor, so far as he was aware, by Erb. We do not think that the mere receipt of the drafts under such circumstances amounted to a waiver, which, in the absence of an express agreement, will not be presumed or implied contrary to the intention of the party whose rights would be injuriously affected thereby, unless by his own conduct the opposite party has been misled, to his prejudice, into the honest belief that such waiver was intended, or consented to; and it is not claimed that such was the case here.

In *Farlow v. Ellis*, 15 Gray [Mass.], 229, it is said: "Waiver is a voluntary relinquishment or renunciation of some right, a foregoing or giving up of some benefit or advantage which, but for such waiver, he [the party relinquishing] would have enjoyed. It may be proved by express declaration, or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage, or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was his intention and purpose to waive. Still, voluntary choice not to claim is of the essence of waiver, and not mere negligence."

In Jones, Liens, sec. 1011, it is said: "The mere taking

of security for the amount of a debt for which a lien is claimed does not ordinarily destroy the lien.  To have this effect there must be something in the facts of the case, or in the nature of the security taken, which is inconsistent with the existence of the lien and destructive of it."

"Sec. 1013. The taking of a mortgage upon the same property upon which the creditor claims a statutory lien, may not displace the lien.   The mortgage is regarded as a cumulative security, and the creditor may enforce either the lien or the mortgage.   So also the taking of the collateral obligation of another person for the payment of the lien debt does not ordinarily debar the lien-holder from claiming the security of his lien, unless the circumstances are such that an intention to waive the lien may be reasonably inferred." (*Payne v. Wilson*, 74 N. Y., 348).

The appellant pleaded, by way of cross-petition to the claim of the Fort Scott Company, that the latter had intervened in an action still pending in the United States circuit court for this district, concerning the same matter, and that that court, by an interlocutory decree, had adjudged the lien of the intervenor to be superior to that of appellant.   An interlocutory order or finding in a pending suit in equity in a federal court is not a final determination of the rights of the parties, but one which may be modified or discharged at any time before the enrollment of the final decree. (*Ayres v. Carver*, 17 How. [U. S.], 592; *Thomas v. Wooldridge*, 23 Wall. [U. S.], 283; *Forgay v. Conrad*, 6 How. [U. S.], 201; *Ex parte Jordan*, 94 U. S., 248.) This order, therefore, did not merge the claim of the Fort Scott Company, and was not a bar to the litigation of the same matters in the state court.   The mere pendency in the courts of another jurisdiction of an action between the same parties, and concerning the same subject-matter, cannot be successfully pleaded in bar or abatement. (*Gordon v. Gilfoil*, 99 U. S., 168; *Sharon v. Hill*, 22 Fed. Rep., 28; *Stanton v. Embrey*, 93 U. S., 548, and authorities there

45

cited.) A demurrer to this answer was therefore properly sustained.

The foregoing conclusions we regard as decisive of the case and as rendering unnecessary the determination of other questions, some of them important and far-reaching, which are discussed in the briefs. The judgment of the district court is therefore in all things

AFFIRMED.

POST, J., dissenting.

I am unable to concur in the conclusions of the majority of the court in this case. In my judgment the law is correctly stated in the following opinion submitted by Commissioner IRVINE, in which Commissioner RYAN concurs:

IRVINE, C.

With most of the conclusions stated in the opinion of the court the writer concurs. He has been unable, however, to reach the same conclusion as to the priority between the mortgage and construction liens. In his view this question must be determined upon principles somewhat different from those upon which the majority opinion is based, and in order that the writer's views may be properly understood it will be necessary to discuss not only the grounds upon which the majority opinion is based, but also other questions arising in argument.

In the first place it is to be observed that our statutes expressly permit railroad companies to mortgage their property and franchises for the purpose of securing money borrowed by them for the construction and equipment of their roads. (Comp. Stats., ch. 16, sec. 117.) And it is also provided that such mortgages may by their terms include and cover not only the property of the companies making them at the time of their date, but property, both real and personal, which may thereafter be acquired by them. (Comp. Stats., ch. 16, sec. 119.)

In the next place the legislature has provided for liens upon railroads to secure laborers and material-men for labor performed and material furnished for the construction, repair, or equipment of such railroads. This lien is created by an act somewhat similar to the general mechanic's lien law, but passed at a different time, and as a distinct act, and differing in many of its particulars from the general law creating mechanics' liens. These liens are wholly the creatures of statute, and depend upon the statute for their existence, extent, and construction. While the statute does not in express terms fix the time when such liens shall be deemed to accrue, the law is so far analogous to the general mechanics' lien law that it is almost a necessary conclusion that the construction placed upon that law should apply to this, to-wit, that the lien attaches from the time labor is begun, or the first material furnished; but as between two or more lienors upon the same improvement there is no priority, unless it be where intervening rights of third persons require a different rule.

A further general observation may be made. A railroad is an entity. Its whole line, including right of way, road-bed, stations, shops, equipment, and all property necessary for the effective operation of the road, in its entirety, constitutes a single property, which cannot, in the absence of statute or of peculiar equities of a very controlling character, be dismembered by selling different portions separately. This general doctrine or policy is too well settled by the uniform current of authorities to permit any extended discussion. The mortgage here in question and the liens must be treated as co-extensive in regard to the property upon which they operate, unless a separation of this property is practicable and required by the equities of the case. Applying the ordinary rule governing the priorities of such incumbrances, the lien of the mortgage would take effect upon the date of its record, July 13, 1889, while the construction liens would not attach until August

20. It is claimed, however, that under the facts of this case the mortgage should be subordinated to the construction liens. The principal ground upon which this contention is based is that a mortgage upon after-acquired property attaches to such property only to the extent of the mortgagor's interest therein, and subject to any liens existing thereon at the time of its acquisition by the mortgagor. This principle is equitable, and is established by the authorities, but is subject to a broader law, that existing liens cannot be displaced in its application. The cases upon this subject appear at first inspection to be somewhat in conflict, but a close inspection of the leading cases establishes a real harmony in the decisions.

In *Galveston R. Co. v. Cowdrey*, 11 Wall. [U. S.], 459, there were several mortgages upon the same railroad, the last in point of time being given to secure a debt for rails used in the construction of the road. It was there held that this mortgage was junior to those which had priority of time. It was held that the junior mortgagee occupied the position of an assignee of the mortgagor, and that by allowing his property to go into the road he had consented that the senior mortgages should attach, to his exclusion. The impracticability of dismembering the railroad and selling its different parts was also emphasized, and so was the fact that the property acquired through purchase from the junior mortgagee had become a part of the real estate and subject to all existing liens thereon.

In *United States v. New Orleans R. Co.*, 12 Wall. [U.S.], 362, the railroad company had purchased certain rolling stock, the vendor in the contract of purchase retaining a lien thereon for the purchase money. It was there held that a blanket mortgage, in existence at the time the rolling stock was purchased, attached to the rolling stock in the condition in which it came into the mortgagor's hands, and only to such interest as the mortgagor acquired, and that, therefore, the lien of the vendor of the

rolling stock was superior to the lien of the mortgage upon
the rolling stock alone.   This seems to be the case where
the doctrine contended for by the appellees was first applied,
and in this case the court said : " Had the property sold by
the government to the railroad company been rails as in
the case of *Galveston R. Co. v. Cowdrey,* or any other ma-
terial which became affixed to and a part of the principal
thing, the result would have been different; but being loose
property, susceptible of separate ownership and separate
liens, such liens, if binding upon the railroad company it-
self, are unaffected by a prior general mortgage by the com-
pany and paramount thereto." In *Fosdick v. Schall,* 99
U. S., 235, and in *Fosdick v. Car Co.,* 99 U. S., 256, the
doctrine of *United States v. New Orleans R. Co.* was re-
affirmed in regard to rolling stock sold to the mortgagor
under a contract of conditional sale, and in *Fosdick v. Schall*
a portion of the language just quoted from the New Or-
leans case was repeated.

The case of *Brooks v. Burlington & S. W. R. Co.,* 101
U. S., 443, was decided upon the statutes of Iowa, which
in terms allow to mechanics a lien upon the building, erec-
tion, or improvement prior to that of a pre-existing mort-
gage upon the land.   Our statutes are not in this respect
similar to those of Iowa.   The distinction will be here-
after referred to.

*Myer v. Car Co.,* 102 U. S., 1, was another case of a
conditional sale of cars, and reaffirmed *Fosdick v. Schall.*

In *Thompson v. White Water Valley R. Co.,* 132 U. S.,
68, a mortgage covering after-acquired property was held
superior to the liens of persons furnishing money for the
construction of a portion of the road upon the profits of
that portion, the portion constructed being within the
original charter of the railroad.

*Williamson v. New Jersey S. R. Co.,* 28 N. J. Eq.,
277, and the same case on appeal, 29 N. J. Eq., 311,
is much relied upon by appellees.   In that case certain

docks were constructed for the Long Branch & Seashore Railroad Company, and the lien claim was filed against the New Jersey Southern company as builder, and the Seashore road as owner. The Southern company seems to have owned a controlling interest in the stock of the Seashore company, but there had been no consolidation of the roads, nor any formal purchase or conveyance. The lien for the construction of the docks was held to be superior to a blanket mortgage given by the New Jersey Southern company, and this priority was established upon the ground that the mortgage of the Southern company attached to the whole of the property of the Seashore company, subject to existing liens. It is plainly intimated that had the work been done for the Southern company upon land then owned by it, the decision would have been different.

In *Botsford v. New Haven, M. & W. R. Co.*, 41 Conn., 454, the lien was for the construction of a depot upon land whose owner agreed to give it to the company, provided that it would build a depot thereon. No conveyance was in fact made, and the lien for construction was held superior to a blanket mortgage upon the railroad, because the legal title had never vested in the railroad and the equitable title did not vest in it until the depot was completed and after the lien attached.

In *Farmers Loan & Trust Co. v. Canada & St. L. R. Co.*, 127 Ind., 250, the court expresses a grave doubt as to whether under the law of Indiana a mortgage can be made to attach to after-acquired property in any event, and the authority of the case upon this question is weakened by the existence of that doubt. Moreover, the court disclaims any attempt to lay down a general rule, but holds that under the special facts of that case the construction lien was superior to the mortgage, and the court was undoubtedly right in its conclusion. The bonds, to secure which the mortgage was given, were issued to a construction company, and the court held that this construction company

could not set up the bonds, given to it under these circumstances, as superior to the liens of material-men for debts which the construction company itself owed them. It appeared that the construction company had hypothecated a portion of the bonds, but when, where, and to whom these bonds had been pledged did not appear, and the court could not in that litigation consider the rights of the pledgees.

Perhaps the best elucidation of the whole question is found in the case of *Toledo, D. & B. R. Co. v. Hamilton*, 134 U. S., 296, where Mr. Justice Brewer reviews the authorities and holds that a blanket mortgage creates a lien whose priority cannot be displaced by a contract between the company and a third party for the erection of buildings or other works of original construction. In this case the lien was for the construction of a dock upon land of which the mortgagor was the equitable owner, and the case was distinguished from the case of *Botsford v. Railroad Co.* upon that ground.

In the *Farmers Loan & Trust Co. v. Kansas City, W. & N. R. Co.*, 53 Fed. Rep., 182, Judge Caldwell in an exceedingly lucid, vigorous, and learned opinion discusses the relative equities of such mortgages and liens, but (so far as the case is analogous to this) upon the basis of what the law ought to be rather than what it has heretofore been declared to be, and gives priority to certain liens as against a mortgagee of the railroad because of conditions imposed upon the mortgagee in the appointment of a receiver at its instance, the conditions receiving the assent of the mortgagee. While we are not disposed to question the correctness of the abstract opinions expressed by Judge Caldwell, nor of his determination of the law as applied to that case, his conclusions are not applicable to this case, where the mortgagee stands upon its vested rights and has not consented to any displacement of its lien nor asked the court for any relief authorizing the court to impose upon it similar conditions.

Other cases might be cited, but the general principles applicable are well illustrated by those referred to, and we do not think that any well considered case can be found in opposition to these principles, which may be briefly stated as follows:

A mortgage covering after-acquired property attaches to such property as it is acquired by the mortgagor. Where such property remains separable and susceptible of separate ownership, the mortgage only attaches to the interest of the mortgagor therein, and does not displace existing liens thereon. Where, however, the after-acquired property becomes inseparably a portion of the real estate to which the mortgage has attached, the mortgage extends to such property, as in the familiar case of a house erected upon a lot burdened by a mortgage. In that case, no one would now have the hardihood, under our statute, to claim that liens for the construction of the house should displace the mortgage, in the absence of special circumstances operating by way of estoppel.

In this case substantially the whole of the right of way had been acquired by the Beatrice road before any work was done by the Kilpatricks, or any ties furnished by the Fort Scott road. The statute gives power to railroad companies to mortgage the whole or any part of their property and franchises, and such mortgage is made binding upon the lands, roads, or other property of the railroad company mentioned in such mortgage. (Comp. Stats., ch. 16, secs. 117 and 118.) This mortgage expressly described the right of way as a part of the property mortgaged. This right of way was real estate to which the mortgage attached the instant it was acquired by the Beatrice road. The work performed and the materials furnished by the lienors were distinctly improvements upon the real estate and inseparable therefrom; in the language of the supreme court of the United States, "not susceptible of separate ownership or separate liens." To give the lienors priority would

compel us to displace the priority of a mortgage existing upon the real property at the time the liens accrued.    This is something which we do not think any court has the right to do.

But the appellees contend that, notwithstanding the principles just stated, they cannot be urged in support of this mortgage, because the bonds, to secure which the mortgage was given, were not in the hands of *bona fide* holders for value.    We can see no force in this contention.    In one sense it might be said that the Investment Company does not occupy the position of a *bona fide* holder; that is, it took the bonds with full knowledge of the facts.    It knew that the railroad had not been constructed; it was bound to know that under the law persons furnishing material or performing labor in the construction of the road might become entitled to liens thereon; and if the rights of the bond holders depended upon their ignorance, at the time of receiving the bonds, of outstanding equities in favor of third persons, they certainly could not be considered *bona fide* holders without notice.    But their rights do not depend upon their establishment of such ignorance.    The Investment Company is a holder for value.    It has advanced the whole loan of two hundred and sixty thousand dollars, and we take it that no one will question the doctrine that a pledgee of such securities is a holder for value to the extent of the indebtedness for which they stand pledged.    The case of *Farmers Loan & Trust Co. v. Canada & St. L. R. Co.*, 127 Ind., 250, is not opposed to this view.    The pledgees in that case were not protected, because, in the language of the court, there was no evidence as to "when, where, or to whom these bonds had been pledged."    The Investment Company advancing its money in good faith and promptly recording its mortgage had a right to rely upon its priority in time, and the lienors, by the record of that mortgage, were notified of the existence of its lien, and entered into their contracts and into their

performance with such notice. Many of the cases in the supreme court of the United States heretofore cited support this view. (See, too, on this point *Henry & Coatsworth Co. v. Fisherdick*, 37 Neb., 207.)

It is argued at great length that the peculiar provisions of section 3 of the act providing for construction liens on railroads, Comp. Stats., ch. 54, art. 2, subject the mortgage to the liens. This section requires for the perfecting of the lien the filing with the proper county clerk of a statement of account setting forth the time when the material was furnished or labor performed, and containing a correct description of the property to be charged with the lien, and verified by affidavit. It is further provided that this statement must be filed by a principal contractor within ninety days from the date on which the last material shall have been furnished, or the last of the labor performed, and continues as follows: " But a failure or omission to file the same within the periods last aforesaid shall not defeat the lien except against purchasers or incumbrancers in good faith without notice, whose rights accrued after the thirty or ninety days, as the case may be, and before any claim for the lien was filed." The construction that the appellees place upon this language is that the only liens which can under any circumstances be superior to the construction liens are those which accrue during such default in the filing of claims, and without notice of the claims. It is quite clear that this construction is not correct. The object of the section referred to is principally to provide for the perfecting of the lien by filing a verified claim, and the proviso is inserted with reference to this objection alone. Prior incumbrancers cannot be affected by the lien at all, much less by a failure to perfect it within time; but for the protection of *bona fide* creditors, whose claims accrue after a default in filing the claim, this proviso is inserted, defeating the lien so in default where necessary to protect such creditors. The language has no reference to incum-

brances prior in time to such liens. To give the section the construction contended for would be to nullify the whole policy of our statutes in regard to recording and the priority of incumbrances, and would conflict with the spirit at least of section 120 of chapter 16, Compiled Statutes, providing that the recording of a railroad mortgage shall be notice to all the world of the rights of all parties under the same.

This point has been much discussed on behalf of some of the appellees and also by counsel interested in a similar question, who, by leave of the court, have filed a brief. Attention is called by all of counsel who argue this question to the similarity existing between the Iowa statutes and our own, but the arguments made differ widely. In one brief it is argued that the similarity of the statutes makes the Iowa decisions closely in point, if not controlling, and that the Iowa decisions favor the priority of the construction liens. But counsel in another brief argue the question upon general principles as to the construction of statutes, reach the same conclusion, but contend that the differences in the statutes render the Iowa decisions inapplicable. The similarities which exist warrant the inference that our law was largely taken from that of Iowa, and were the statutes in all points essentially similar we should feel bound to give our law the construction placed upon the Iowa law by the courts of that state before ours was adopted; but the statutes differ in at least one very important feature, and the decisions do not support the contention of the appellees.

Section 3 of our law, relating to the filing of a claim of lien and the effect of the failure to file the same within the time provided, is similar to section 6 of the Iowa law. Section 9 of the Iowa law, however, contains provisions establishing the position of liens in respect to other incumbrances. One of these provisions is the following: " The liens for the things aforesaid or the work, including

those for additions, repairs, and betterments, shall attach
to the buildings, erections, or improvements for which they
were furnished or done in preference to any prior lien or
incumbrance or mortgage upon the land upon which said
erection, building, or improvement belongs is erected or
put." There is no such provision in our statute. It was
because of that provision or a similar.one, of which that is
amendatory, that the supreme court of the United States in
*Brooks v. Railroad Co., supra,* held the construction liens
paramount to the mortgage. In all the Iowa cases where
such liens have been held prior to existing mortgages the
decision has been based upon section 9. In all the cases
wherein section 6 has been construed the question was not
between construction liens and prior mortgages, but be-
tween construction liens and subsequent mortgages; and
the course of decisions has been exactly in accordance with
the construction which we have above placed upon section
3 of our law. The case of the *National Lumber Co. v.
Bowman,* 42 N. W. Rep. [Ia.], 557, clearly states the com-
bined effect of these two sections, and shows that in the
absence of section 9 the superiority of a mortgage prior in
time to the construction liens could not be denied.

It is also urged that the bonds are void, or at least non-
negotiable, as not conforming with that portion of section
117, chapter 16, Compiled Statutes, which authorizes rail-
road.companies to "issue their corporate bonds, * * *
secured by said mortgages or deeds of trust, * * * con-
vertible into stock or not, as shall be plainly expressed on
the face of each and every bond so issued by said company."
These bonds are on their face an absolute obligation for the
payment of money. Their language in this respect is as
follows: "Promises to pay in gold coin of the United States
of America of the present standard, weight, and fineness,
or at the option of the holder, in sterling money at the
fixed rate of 49½ pence per dollar." The objection made
is that this bond fails to express on its face whether or not

it is convertible into stock. We construe the statute as requiring that if the bonds be convertible into stock, such fact shall be plainly expressed on their face. A more distinct and absolute obligation to pay money alone could not be expressed than is expressed on the face of the bonds in question.

Another contention is that the mortgage is in excess of the power conferred upon the corporation, in that the authority to execute mortgages is confined to roads which already have some portion of their line constructed. This contention is based upon the clause in section 120, already referred to, requiring such mortgages to be recorded in each organized county "through which said road mortgaged or deeded may run in this state." The construction given to this language is too narrow. The word "run" in the statute is an unfortunately inexact term, but its meaning is reasonably clear, and the language taken in connection with the rest of the statute requires that it should be given a future as well as a present construction. In other words, that the word "may" should be construed in the sense of "shall hereafter." No other construction is reasonable.

A further argument urged to sustain the position that the bonds are void is based upon the allegation that their amount is in excess of the maximum indebtedness permitted by law. It is claimed in argument that no lawful stock was issued by the Beatrice Company, or if any was issued, that its amount was not sufficient to sustain the indebtedness created, or attempted to be created, by the bonds. Whether or not evidences of indebtedness of a corporation beyond the limit permitted by law are absolutely void, as the appellees contend, need not here be determined. We cannot see how the appellees could avail themselves of such defense. The bonds were all issued before the contracts were made with the appellee, and if the issue of bonds was beyond the power of the corporation in the incurring of indebtedness, *a fortiori*, the indebtedness to the lienors

was *ultra vires.* The lienors and bondholders would stand
in precisely the same position, and it does not lie in their
mouths to raise the objection. (*Porter v. Pittsburg Bessemer
Steel Co.,* 120 U. S., 649.) Furthermore, the proof does not
sustain the appellees' contention. Section 5 of article 11 of
the constitution prohibits railroad corporations from issuing
any stock or bonds except for money, labor, or property
actually received and applied to the purposes for which
such corporation was created. The articles of incorpora-
tion of the Beatrice road fix the capital stock at one million
dollars. The only evidence in the record as to the issuance
of stock is found in the contract of lease between the Be-
atrice road and the Wyandotte road, and in letters passing
between officers of the Investment Company and officers
of the Beatrice and Wyandotte roads. These letters, ex-
cept in so far as they amount to admissions binding upon
the corporation by whose authority they were written, do
not constitute competent evidence upon the subject. The
inference from the documents, however, is that the Beatrice
road has issued seven hundred and fifty thousand dol-
lars of stock; sufficient, if properly issued, to carry the
bonds. It does not appear that any of this issue was
illegal, unless it be certain stock issued to the Wyandotte
Company in consideration of the covenants in the contract
between the Beatrice and Wyandotte companies. Among
these covenants was that of guarantying the bonds, and
also of paying certain rentals, and performing many other
duties in connection with the lease. It is not questioned
by counsel that between companies occupying such relations
one may hold the stock of the other, and in the absence of
evidence, at least, as to the value of the covenants obtained
from the Wyandotte road, it cannot be said that this stock
was not issued for money, labor, or property actually re-
ceived.

The majority opinion is largely based upon the conclu-
sion that the Investment Company made itself a promoter

or principal in the construction of the road.    This conclusion is reached upon the doctrine first established in this state in the case of *Bohn Mfg. Co. v. Kountze,* 30 Neb., 719.    The principle decided in that case has recently been much discussed in the cases of *Pickens v. Plattsmouth Investment Company,* 37 Neb., 272; *Holmes v. Hutchins,* 38 Neb., 601, and *Sheehy v. Fulton,* 38 Neb., 691.    It is not necessary to repeat that discussion.    We do not think the facts of this case warrant the court in applying that doctrine. Wherever it has been applied it has been for the purpose of charging the estate of the owner in fee on account of improvements made by his executory vendee.    The court has in all cases for its application required the proof of facts sufficient to create the vendee the agent of the vendor expressly or by implication.    Its application to this case requires a far-reaching extension of the principle.    The Investment Company had no estate in the railroad company; it was not even a stockholder in the corporation; and we do not think it can be deemed an "owner" within the meaning of the mechanic's lien law.    It is true that the Investment Company in making the loan insisted upon the method to be adopted for the construction of the road, and had extended negotiations with its promoters in regard to the organization of the company and the form of the loan and its security.    We cannot see in these acts anything more than precautionary measures to secure the loan about to be made, and we believe that if the opinion of the majority be adhered to in future cases and carried to its logical conclusion, every one who lends money to another with the knowledge, or at least with the intention, that the borrower shall use the money to erect improvements upon land pledged to secure the debt, must be held to have rendered his security subject to any mechanics' liens arising out of the construction.    This result would be contrary to the reason of past adjudications and we think unwarranted in principle.