STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, V. BEEMER STATE BANK: CLARENCE G. BLISS, RECEIVER, APPELLEE: MARY SCHLICKBERND, INTERVENER, APPELLANT.

FILED MAY 11, 1932. No. 28042.

*John J. Gross*, for appellant.

*F. C. Radke, Barlow Nye, M. Craft Radke* and *Fred S. Berry*, contra.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

EBERLY, J.

This is an action in the receivership of the Beemer State Bank by Mary Schlickbernd as intervener. She alleges that on the 12th day of December, 1921, there was deposited in said bank for safe-keeping $4,000 in Liberty

bonds under an agreement with the bank that it should place said bonds in its vault for the purpose of keeping them safe from fire, theft and other hazards; that she is the owner thereof; that thereafter said bank returned to intervener $1,000 of said bonds; that the numbers and amounts of the bonds remaining were as follows:

| Issue | Number | Amount |
|-------|--------|--------|
| 3d | 135130 | $500.00 |
| 3d | 671520 | $500.00 |
| 4th | 00559022 | $500.00 |
| 4th | 00559023 | $500.00 |
| 4th | unknown | $1,000.00 |

Intervener further alleges "that, at some time unknown to intervener, said bank converted said bonds into money and placed said money with the money belonging to said bank, all without the knowledge or consent of intervener, said bank becoming thereby trustee for the use of intervener for said sum of three thousand dollars," and that said sum "constituted a part of the alleged assets of said bank" that came into the possession of the receiver; and intervener prays that she may be paid in full out of the assets of that institution. To this petition the receiver tendered as his answer a general denial. There was a trial to the court resulting in a finding for the receiver and an order of dismissal of intervener's petition, from which order an appeal is prosecuted.

From the record it appears that for a number of years prior to September 17, 1928, this institution was a going concern at Beemer, Nebraska, and at the close of business on that date was taken over by the guaranty fund commission in an insolvent condition. A report of its then financial condition on that day made by its cashier sets forth that its "resources" then totaled $974,089.81, and embraced among others the following items: Due from Union National Bank at Fremont, Nebraska, $42,574.49; from Omaha National Bank, $73,889.09; deposits $817,928.37; bills receivable (approximately) $749,000; cash items $39,068.56.

None of the parties to this litigation now question the fact that the original bonds in suit were not in possession of the bank on the date of this report, and had not been for an indefinite number of years prior thereto, and it may be said that there is an entire failure to establish, as a fact, that the proceeds thereof in any manner entered into or became the source of any of the items of property set forth in this report of the financial condition of this institution which were taken over by the guaranty fund commission, or which ultimately came into the possession of the receiver, the defendant herein.

This report, already referred to, is sworn to positively by J. S. Severa as cashier of this bank. It also appears that he had occupied that position and had been active in the conduct of the affairs of this bank for many years, including the entire scope of the transaction in suit. He was thus in a position at the time he made such report to know the facts, and he verifies this report positively under oath as "a true statement of the condition of the bank;" that therein "all resources and liabilities are shown under the proper designation," and that "said bank has no liabilities of any character * * * whatsoever not set forth in said statement."

It is also a conceded fact that intervener's claim in suit, so far as based on the bonds purchased in 1919, is not included in, and forms no part of, the liabilities of the bank listed in this report, nor so far as disclosed by satisfactory evidence are there any entries relating thereto to be found in the public records of this bank. True, the report is a false report. The fact is established that on its date the true credit balance of the Beemer State Bank in the Omaha National Bank was approximately $7,000; that instead of a credit balance with the Union National Bank of Fremont, Nebraska, it was in fact overdrawn more than $3,000; that the true amount of actual deposits therein previously made which remained unpaid to the depositors was in excess of $1,200,000, and of the $749,000 of bills receivable then carried on its books and listed in this report as assets approximately $484,000

were forgeries, and but $264,000 were genuine. Indeed, this same Severa as a witness, in his oral evidence, confirmed the fact that "Mr. Wupper as president of the bank was several hundred thousand dollars short at the time the bank was closed," and that they "had forged papers in the bank."

The appellant, in this court, in effect frankly admits that the original bonds which Henry Schlickbernd purchased in 1919, and which under the allegations of her pleading constitute the bonds in suit, are not now in the assets of this insolvent bank, and that no proceeds thereof can now be identified in any specific item of property or fund now owned or possessed by this institution. It is also now insisted that this bank at some indefinite and uncertain time sought to, and did, replace and substitute for the bonds it received in 1919 (the bonds in suit), and which had previously been disposed of in some manner, certain other and different United States bonds obtained by it, through means and on a date not disclosed, aggregating the same amount, viz., $3,000. These substituted bonds were the bonds identified in intervener's petition by issue, number, and denomination, and were mistakenly alleged to be the bonds delivered to this bank in 1919, which were with others transmitted by it to, and sold by, the Omaha Trust Company on January 7, 1924. The sale price of these bonds was thereupon transmitted to the Omaha National Bank, and credited by that institution to the Beemer State Bank. By the 22d day of January following, this credit balance had been reduced by withdrawals made in the usual course of banking business to $811.40. Still subsequently the entire balance due this Beemer State Bank was offset by the Omaha National Bank against, and applied to, bills payable of the former institution that it owned. These facts, under what claimant denominates the "Federal rule" as announced and applied by this court, would not sustain intervener's contention. But it is insisted by this transaction the assets of the Beemer State Bank were $3,000 richer than they otherwise would have been, and thus intervener's claim

of preference is sustained. In fact, this constituted the sole basis of her claim.

The testimony of the intervener affords little light on the controlling issues of this litigation. It is, in substance, that her husband owned $4,000 in Liberty bonds at the time of his death on November 11, 1921; that these bonds were bequeathed to her in his will, which was duly probated; that such bonds, though left at the bank, were not kept by the testator in his box at the Beemer State Bank; that "he had the slip;" that on December 12, 1921, Mary and Fred Schlickbernd called at the bank and "must have" talked to President Wupper about these bonds; that at that time a written receipt was given them, dated on that day, and reciting that the Beemer State Bank had "Received of Mary and Fred Schlickbernd, Executors, Liberty bonds amounting to four thousand dollars," but the numbers, series, kinds and denominations of these bonds are not stated in this receipt; that intervener has never seen these bonds, and they were not produced at the time this receipt was given; that thereafter she received the interest on these bonds annually, in the spring of the year, but no interest was ever paid her in the fall of the year; that she never told anybody to sell these bonds, but one $1,000 bond was sent in and the proceeds credited to her account. There is no evidence that she ever had any information as to any disposition by the Beemer State Bank of the remaining $3,000 of the bonds received from her husband until after the "failure" of this institution in September, 1928, or that she ever consented to, or approved, any claimed substitution of bonds therefor made by the officers thereof, or indeed had any knowledge that it ever occurred.

The record before us discloses that the sole support of intervener's contention is to be found, if at all, in the testimony of J. S. Severa, who was the cashier of the Beemer State Bank during the time all the transactions involved herein occurred. His evidence, which in a number of material matters is in direct conflict with the statements of the report already referred to, is in part

substantially as follows: Henry Schlickbernd was a customer of this bank and he had known him for fifteen years; that on the following dates Schlickbernd bought, through the bank, government coupon bonds in amounts and numbers as follows, viz., February 12, 1919, two, fourth issue, No. 2,223,535 and No. 2,223,536, $1,000 each; on May 29, 1919, one, first issue, No. 1,818,464, of $1,000; and on May 29, 1918, one Liberty bond, third issue, No. 330,426, of $1,000—total $4,000; that Schlickbernd left these bonds at the bank; that he had a safety deposit box in the bank, but these bonds were not put therein by Schlickbernd, nor taken therefrom by the bank employees; that "Mr. Wupper told him (Schlickbernd) that they wanted to keep them in the cash box in the vault because it was short and that is where they were kept, and he (Wupper) gave the customers receipts for them." As to the time these original bonds were taken from this bank cash box by parties whose identity is not disclosed, and disposed of in some manner, this witness testifies on direct examination, "I could not be accurate. It was between the time they were purchased and the closing of the bank. That would be as near as I could fix it." As to the method of replacement of these original bonds after they had been disposed of, he testifies as follows: "Q. When you purchased the substitute bonds, what did you do with them? A. Replaced the ones we had taken out. Q. Do you mean you gave them back to the Schlickbernds? A. No, sir. They were carried as a bank asset. Suppose we were short of cash. The bonds would be sent away. Later on we would purchase bonds and put in as assets." He further testifies that if customers' bonds were stolen no entry would appear on the books of the bank of that fact.

It is to be remembered in this connection that property of which this bank was bailee, or which came into its possession as a special deposit for a particular purpose, and which was subsequently removed from its possession, embezzled, or stolen by its officers, agents, or servants for their own private enrichment or private benefit, and

which did not augment the assets of the institution, cannot be made the basis of the preference claimed in this proceeding. The books of the bank are not produced in this case, and there is no satisfactory evidence of any entry therein concerning the receipt by the bank of these bonds or of the disposition made thereof appearing in this bill of exceptions.

It would seem beyond question that the original transaction between this bank and Schlickbernd was not a mere bailment of bonds for safe-keeping, but rather an accommodation loan thereof to that institution for the express purpose of being used as the assets thereof. Being made pursuant to an express agreement of, and actually contemplated by, all parties in interest, the placing of the bonds of 1919 among the assets of this bank ·in its cash vault to cover an existing shortage therein, and their use by the bank as its own property for this limited purpose at least so long as the bonds themselves remained in its actual possession and control, could not be deemed a technical conversion thereof. It was only, if at all, when these obligations, in violation of its engagement, actually passed out of its possession and control by actual sale or other disposition made by such bank, and the proceeds of such sale or the avails arising out of such transaction were actually received by it or actually applied to its benefit, that an actual conversion by the bank has occurred, within the meaning of the rule which intervener invokes to sustain her present claim.

So, also, these bonds, in effect payable to bearer, and under the arrangement established by the testimony placed in the bank's cash box for the express purpose of covering or concealing a "shortage" in the contents thereof, not only clothed the bank with every indicia of ownership, but constituted a device pregnant with fraud and obviously deceptive and dangerous to the examiners of the state, as well as to boards of directors. There is no evidence of any subsequent change in the terms of this agreement of 1919 in December, 1921.

Again, intervener's pleading limits her recovery to conversion of bonds in violation of a contract of bailment of 1919 or 1921, and finds no support in the evidence. *Allegata et probata* must agree.

However, waiving all questions of pleading, and assuming the action as tried to the court by mutual consent of the parties to be based on the alleged conversion of certain "substituted bonds" (so called) in January, 1924, there is no satisfactory evidence of the receipt by the Beemer State Bank of any proceeds or benefits for, because of, or arising out of the removal of the bonds received by it from Schlickbernd in 1919 from its assets and possession, nor does it appear that any such proceeds arising from the disposition of the bonds of 1919 constituted any part of, or entered into, the consideration paid by it for the bonds sold by it in the transaction had in January, 1924.

So, too, there is no satisfactory evidence in the bill of exceptions that the bonds disposed of by the Beemer State Bank were purchased and set apart to and for the intervener. The undisputed evidence is that these bonds, sold in January, 1924, were purchased by that bank as disclosed by its records, as its own assets, and were exclusively employed by it as such. They were not set apart as the property of the intervener on its public records, nor kept as such among its assets.

The evidence wholly failing to establish the facts essential to the creation of a trust fund, it follows that the action of the district court in dismissing the intervener's petition is right, and is

AFFIRMED.

ROSE, J., dissenting.

In my view of this case, the affirmed judgment directs the receiver to distribute the proceeds of claimant's converted bonds to bank creditors having no lawful right thereto. Regardless of the purpose for which the bonds were procured from claimant, the Beemer State Bank is accountable to her as trustee under established rules of law and equity. Without authority, it officiously under-

took to manage the securities of claimant for her and consequently is answerable to her for its acts as her trustee. Civil consequences of a corporate swindle are not necessarily averted by insolvency. The insolvent state bank remains in existence as a corporation for the purposes of liquidation, including accountability as trustee where it acted in that capacity.

In a proceeding to wind up the bank's affairs, Mary Schlickbernd, claimant, intervened and presented a preferred claim for $3,000, payable in full as a trust fund out of the assets in the hands of the receiver. Confidingly trusting the corporation which had been chartered by the state to conduct a lawful banking business, she had left with it for safe-keeping a meager estate consisting of bonds to the extent of $4,000. The bank did not confine its control or duty to the safe-keeping of the bonds, but officiously, without the consent of claimant, controlled and managed them for her; paid her the interest on them; returned bonds in the sum of $1,000; retained the remaining bonds for $3,000 and exchanged them for others. The bank procured for itself and used in its banking business the proceeds of the bonds received in exchange. The tainted fruits of the trustee's officious management and betrayal of trust did not inure to any officer of the bank. As I understand the record, evidence of these facts is uncontradicted. The bank is not in a position to escape accountability by blaming its iniquities on its officers. The controlling rule of equity has been stated as follows:

"A person gratuitously or officiously assuming as agent or trustee to control or manage the property or interests of another is as firmly bound by the implied terms of his confidential relation as one who is regularly employed and paid." *Nebraska Power Co. v. Koenig,* 93 Neb. 68. See *Wright v. Smith,* 23 N. J. Eq. 106.

The supreme court of Nebraska unanimously committed itself to the following doctrines:

"It is firmly established, both by English and American courts, that a trustee is bound to perform faithfully the

duties relating to his trust, and that in doing so he cannot allow his own interests to interfere. If he unites his personal and representative capacities, he confuses transactions which the law requires him to keep separate and distinct. If he attempts to acquire an individual interest in the subject-matter of his trust or agency, he creates a temptation to serve himself at the expense of the beneficiary or principal, and enters a realm where his secret purposes with reference to trust property or interests may escape judicial scrutiny. To prevent evil consequences from growing out of the advantages which his position gives him, it will be presumed that what he does in relation to the interests or property involved in the trust or agency is done in a representative capacity. For the same reason, any advantage beyond proper expenses and compensation belongs to the *cestui que trust.* Adherence to these doctrines keeps personal and representative transactions free from entanglement, removes from the fiduciary the temptation to gain an undue advantage, and permits courts of equity to enforce the rights of the beneficiary. The philosophy on which these rules of law and equity rest came down through the centuries from the Chancellor of Galilee. The wisdom and necessity of such doctrines become more apparent as the forms in which property is held multiply under new conditions, and as earning capital in the custody and control of agents or trustees follows new enterprises over the world, where it is not under the watchful eye of the owner. Courts of equity do not set bounds to the principles which control the conduct and fix the accountability of trustees. The elasticity of these rules extends their applicability to all of the devices invented by unfaithful fiduciaries to evade their obligations or to defeat the imperative demands of business integrity and sound public policy." *Nebraska Power Co. v. Koenig,* 93 Neb. 68.

The proceeds of the bonds or the equivalent thereof in money were procured and used by the bank in banking transactions. If they are not now in the hands of the receiver, they either augmented the bank assets or re-

duced the bank indebtedness to the extent of $3,000. The trust fund in some form went to the credit of the bank. In the changed form it belongs to claimant, the beneficiary of the trust. It was not a deposit subject to check. Claimant did not elect to treat it as a deposit. It is not an asset of the bank. It is not property belonging to creditors. Neither the legislature nor the court of equity has any right to turn claimant's trust property over to depositors. Depositors entrusted their money to the bank to be used by it in commercial transactions. Claimant did not. In equity her claim is not in the same class as claims of depositors. There is no legal or moral justification for classifying claimant with general depositors. Claimant did not commit any wrong. She traced her individual property into the bank. The bank unlawfully mingled it with bank assets, the mass of which is chargeable in equity with the trust fund of claimant. She is entitled to have it restored in its changed form out of the assets in the hands of the receiver. *Central Nat. Bank v. First Nat. Bank,* 115 Neb. 472; *State v. Farmers State Bank,* 121 Neb. 532; *State v. State Bank of Touhy,* 122 Neb. 582. The devices employed by rascals to cheat honest and confiding persons out of their property should not be allowed to multiply faster than the means of equity to redress civil wrongs. The judgment permitting the receiver to distribute the trust property of claimant among the depositors of the Beemer State Bank should be reversed and the receiver ordered to pay her claim in full out of the assets in his hands.