FIRST TRUST COMPANY OF LINCOLN, TRUSTEE, APPELLANT, v. EXCHANGE BANK ET AL., APPELLEES.

FILED APRIL 27, 1934. No. 28777.

*Woods, Woods & Aitken* and *Nye & Nye*, for appellant.

*Miller & Blackledge* and *N. P. McDonald, contra.*

Heard before GOSS, C. J., ROSE and PAINE, JJ., and CHASE and ELDRED, District Judges.

ELDRED, District Judge.

Frank A. Hershey died leaving a will which was admitted to probate; and on June 14, 1918, Ira A. Kirk was appointed trustee of certain assets of said estate, accepted such trust, and acted as such trustee from the date of his appointment to May 3, 1930, on which date he was removed from such position, and the plaintiff (appellant), First Trust Company of Lincoln, Nebraska, was appointed trustee by the district court for Buffalo county.

On and prior to the date of his appointment as such trustee, and continuously thereafter, up to December 29, 1929, Ira A. Kirk was president, a principal stockholder, and active managing officer of the appellee Exchange Bank, Gibbon, Nebraska. December 29, 1929, said bank was closed by the department of trade and commerce, after which time Kirk was no longer connected with the management thereof. Appellee S. L. Leas is trustee and has in his possession or control assets of the Exchange Bank, which he holds in trust for the benefit of depositors and creditors.

This suit was instituted by the First Trust Company of Lincoln, trustee of the Hershey trust estate, as an action in equity, against the Exchange Bank, Gibbon, Nebraska, Ira A. Kirk, and S. L. Leas, trustee, for an accounting and the recovery of the sum of $2,900, with interest from October 18, 1923, claimed to have been wrongfully invested in the notes of Clarence K. Geyer. Plaintiff fur-

ther prays that the assets of said bank be impressed with a trust for the amount found due; and that recovery be adjudged a lien against the assets of said Exchange Bank in its possession and in the possession of S. L. Leas, trustee, superior to the claims of the depositors and creditors.

Among the assets delivered to the plaintiff, as the new trustee of the Frank A. Hershey trust estate, were four promissory notes signed by one Clarence K. Geyer, all dated July 11, 1923, two notes being for $500 each, due one year after date, and one for $1,000 due nine months after date. These three notes were payable to the Exchange Bank, Gibbon, Nebraska. The fourth note has no payee nor date of maturity designated. All four notes were indorsed, "Exchange Bank, without recourse, I. A. Kirk, Pt."

The plaintiff contends: (a) That the Geyer notes were worthless, and known by Kirk to be worthless at the time they were sold to the trust estate; that the investment was an improper one, made without approval by any constituted authority, and was a breach of trust imposing an obligation on Ira A. Kirk, the trustee making such investment, to restore the funds thus wrongfully diverted; (b) that the Exchange Bank, through its president and active managing officer, had knowledge that the funds of the trust estate were being wrongfully diverted, knowingly participated in such wrongful diversion and profited thereby; and the assets of the bank being augmented by the breach of trust, it is chargeable as a constructive trustee with the duty of accounting to such trust estate therefor; (c) that, since the trust fund has been traced into the bank and its assets augmented thereby, the plaintiff is entitled to have the assets of the bank, in its direct control, and also the assets of the bank deposited with S. L. Leas, trustee, impressed with the trust for the amount wrongfully diverted, with interest, prior and superior to any claim or lien of depositors and creditors in the bank.

The defendants, answering, admit certain formal allega-

tions of the petition; deny other allegations; plead the statute of limitations and laches, reorganization of the bank and estoppel; and that Kirk, with the permission of the county judge of Buffalo county, executed to such judge a real estate mortgage to secure said notes, which security defendants contend should be first exhausted. On trial in the district court there was a finding and decree in favor of all defendants and against plaintiff. Plaintiff appeals, and the case is here for trial *de novo*.

During the time of the transactions involved herein, Ira A. Kirk, as trustee of the trust estate of Frank A. Hershey, kept funds of said trust on deposit in the Exchange Bank. At the same time he was president, a principal stockholder and active managing officer of said bank. On the 18th day of October, 1923, said bank was the owner and holder of the notes of Clarence K. Geyer, previously described, and also one other note for $900, the same being a part of the assets of the bank. On said date the appellee Kirk, as trustee of the Frank A. Hershey estate, purchased of the appellee Exchange Bank, through himself as its president and active managing officer, four notes totaling $2,900, the purchase price of $2,900 being paid out of the cash of the trust estate on deposit in the Exchange Bank, and said money was paid to the bank and mingled with its general mass of assets.

The briefs of appellees are devoted almost entirely to the discussion of the contention that the amended petition of appellant does not state facts sufficient to constitute a cause of action. No demurrer was filed to the amended petition. The sufficiency of the amended petition was first raised after issues of fact were joined, by demurrer *ore tenus;* that is, by objection to the introduction of evidence. "The rule is that, after issues are joined, the pleadings will be liberally construed. But when a pleading is tested by demurrer, before issue joined, it is construed most strongly against the pleader." *Frye v. Omaha & C. B. Street R. Co.,* 106 Neb. 333. See *Johnston v. Spencer,* 51 Neb. 198.

It is urged that it appears from the face of the petition that the cause of action is barred by the statute of limitations and laches, and that fraud is not sufficiently pleaded. As to the wrongful or fraudulent acts which are the basis of this action, the petition alleges the relationship of Kirk to the Exchange Bank, and his position as trustee of the Hershey trust estate; that the bank was the owner of the Geyer notes described on October 18, 1923; that both the bank and Kirk had full knowledge that said notes were worthless and uncollectible; that the notes were fraudulently sold and transferred by the bank through Ira A. Kirk, its president and active managing officer, to Ira A. Kirk, trustee of the Frank A. Hershey trust, for a consideration of $2,900; that sum was delivered by Kirk from the assets of the trust estate to the Exchange Bank; that Ira A. Kirk, as president of the bank, indorsed said notes "without recourse" on the Exchange Bank; and that the assets of said bank through such acts were augmented and enhanced to the extent of $2,900 at the expense of said trust estate, which transaction is alleged to have been a breach of trust and a wrongful and fraudulent act. The wrongful and fraudulent acts complained of consisted in the breach of the trust by the trustee, alleged to have been participated in by the Exchange Bank. The amended petition sets forth, in a general way, the ultimate facts as to the claimed wrongful and fraudulent acts relied upon. The facts are not as fully detailed as they might properly have been; but, giving this amended petition the liberal construction to which it is entitled, it not having been attacked by demurrer, we hold the allegation as to the wrongful and fraudulent acts sufficient at this time.

The amended petition alleges that neither the plaintiff nor the beneficiaries of said trust had any knowledge of said wrongful and fraudulent acts until the appointment of plaintiff as trustee of said trust estate about the 3d day of May, 1930. The want of knowledge of the alleged wrongful and fraudulent acts is set out as specifically, if not more so, than it was in the petition in the case of *Abbott*

*v. Wagner,* 108 Neb. 359, an action for relief on the ground of fraud, in which on page 381 of the opinion it is stated: "We do not think that there is any merit in the contention that it appears from the face of the petition that the statute of limitations has run against the plaintiffs' cause of action. One of the allegations of the petition is: 'That the plaintiffs did not discover the fraud attempted by the defendants (named) as above set out, until within two years prior to the filing of this petition.' "

As to the evidence bearing upon the statute of limitations and laches: The transaction involved was solely between Ira A. Kirk, as president and active managing officer of the Exchange Bank, and the same Ira A. Kirk, as trustee of the Hershey trust estate. After the date of that transaction, October 18, 1923, and prior to the 5th day of February, 1930, Kirk filed reports as trustee for each year with the county judge. The reports for 1926 and 1927 did not attempt to itemize investments; but for the other years, beginning with 1923, investments were itemized. In none of the reports was any mention made of having any Geyer notes; but Kirk states, in his testimony on the trial, that he included the amount invested in the Geyer notes with the amount charged against himself personally; and it was not until the report was filed for the year 1929, under date of February 5, 1930, that investment in the Geyer notes was disclosed. Until that time Ira A. Kirk appears to have been the only person who was possessed of any knowledge of the transaction. When effort was made to ascertain from Kirk, while a witness, why he listed the Geyer notes as "I. A. Kirk" on his report for 1923, he stated, "maybe looked better;" and when pressed further as to that and other reports, his replies were evasive and unsatisfactory. By his acts Kirk concealed the investment in the Geyer notes from the county court and all others who might have examined the records. He testified that he never advised the beneficiaries, either by correspondence or orally, of the investment. The facts disclosed by the

record were sufficient to toll the running of the statute of limitations. *Lewis v. Welch*, 47 Minn. 193.

Prior to the 3d day of May, 1930, Ira A. Kirk was the trustee of the Hershey trust estate, by whom an action for the recovery of the trust fund should have been instituted. He was himself one of the alleged wrong-doers whose acts constituted the basis of this action. The Exchange Bank, through the acts of said Kirk, its president and active managing officer, participated in and its funds were augmented by the wrongful acts of said Kirk, as its president and active managing officer, at the expense of said trust; hence, said bank was a joint wrong-doer. Under such circumstances the doctrine of laches has no application. 21 C. J. 238; *Williard v. Campbell Oil Co.*, 77 Mont. 30.

Prior to the fall of 1917, Clarence K. Geyer had been employed as a farm hand; he was then about 28 years of age and unmarried. That fall he borrowed of Roscoe Lunger, an officer of the Commercial Bank, Gibbon, Nebraska, $70 to buy a cow; Geyer then had no money to put into the deal; the returns on the sale of the cow came back to the bank, and the profits were divided. He had a series of transactions of a similar nature covering a period of some two months, during which time he made a profit of about $2,400. He wanted to enlist in the war and went back to Pennsylvania for that purpose. Before leaving he bought about $400 worth of clothes, took $1,000 with him, and left $1,000 in the bank about two months, when it was drawn out. The witness Lunger considered Geyer of exceptional ability as a buyer of cattle; very good in the handling of stock; square in his deals, and never heard his honesty questioned.

W. F. Graham: First saw Geyer in 1917, herding sheep for Marshall Ross; after he left the employment of Ross, he was buying stock; the first time he left he went to the army; the last time he said he was going to western Pennsylvania; reputation for honesty and integrity good;

was sober, of good moral character, and skilful in the live stock business.

The foregoing shows the activities, history and personal standing of Geyer before he entered the army prior to his transactions with the appellee Exchange Bank, which began several years later.

Roscoe Lunger: Fully two years after the war before Geyer came back; said he wanted to make arrangements to buy stock again; that Marshall Ross had agreed to loan him or give him $500 if he would do business with the Exchange Bank. He wanted to start buying on a more extensive scale; wanted to go to Denver and furnish cattle for feeders around there, "and I told him that would take too much money and I told him I couldn't see my way clear to do it; I didn't have the money."

Ira A. Kirk, appellee: Did not know Geyer in 1918; but he was there, I guess. He was there before the war, as I remember it. Didn't know him then. Knew what he was doing. Commenced doing business with him about June, 1922. He might have deposited a little money to start an account and then let it run as an overdraft. Believe the amount he started the account with was $500. If I loaned it I had some one sign the note with him; kind of remember that Ross signed the first note. Do not believe he had any property or real estate then; might have had some horses. Would ship stock and the money would come back to the bank from the commission firms; he had an account, and if there was an overdraft, would let it stand until he got remittance, then would credit his account. Quit doing business with him about July, 1923. His business had run behind; could not pay all losses suffered; took notes to protect bank for overdrafts; had no security and no collateral; notes taken July 11, 1923, do not know why not put on discount register until August 6, 1923, nor how bank ceased doing business with Geyer. He went away from there; suppose that was the end of our business, probably; do not know when he left. "Q. Mr. Geyer's business transactions had been unsuccessful, is

that correct, during the period that the bank— A. Well, they were, yes, through that period. Q. During that period? A. That is mostly; yes. He made money, plenty of it, but he lost it all in probably a few shipments, the way I remember it." Well, we thought we had advanced enough. When Geyer ceased doing business with the bank, the obligations of Geyer to the bank were $2,900; it might have been $3,900. Thought Geyer was of good ability and good reputation. About 33 years of age when we began doing business with him. Knew he was honest and had made money and supposed he would do it again. Disposition to pay debts was all right. Would pay them when he could. "Q. You stated that your business with Geyer was conducted in a profitable way. Just when did he conduct any business with you in a profitable way? A. It is hard to tell that, but he made money on a good deal of the shipments, but he lost more. Q. He lost more than he made? A. He lost on other shipments; yes. He was a real good money-maker on the most of it. Q. At the end of the time that you dealt with him it wasn't a profit, was it? He lost money? A. Well, of course he owed us some when he quit. * * * He didn't have the money, of course. * * * Q. And what stopped him doing business was the fact that the bank shut off his credit and wouldn't let him draw on it any longer, isn't that a fact? A. Yes; I think that is so. We thought he owed us enough. Q. You thought it wasn't any use going any further? A. I suppose that was it. Q. Now, you say Geyer had a disposition to pay his debts. As a matter of fact, you lost all track of where he was, didn't you? A. Yes. Well, he got out of the notion of paying them when he got away, but I believe he would pay them out if he could make enough money. He was honest, a good fellow." The $900 note was indorsed the same as the others, but was paid later out of the profits of the bank.

S. L. Leas, trustee, appellee: President of appellee Exchange Bank, Gibbon, since its reorganization. Did not know of Geyer owning any property when he left.

W. F. Graham: I would not know the date when he (Geyer) left; no, sir. It was after he had a lot of bad luck buying cattle in Denver. He bought three big loads of cattle in Denver; heavy stuff, and the market broke, and he held them a while, and the market kept going and going. That was Geyer's first big downfall. That was the last of his buying here. He was around quite a while before he left; maybe a month. He kept getting worse and worse. He did not have a sale before he left. He did not have anything. He cleaned up all of his stuff.

The foregoing gives a history of the business activities and financial experiences of Geyer, as well as his standing and reputation, from the time he commenced doing business with the Exchange Bank, appellee, until the notes involved herein were sold by the Exchange Bank through Ira A. Kirk, its president and managing officer, to Ira A. Kirk, trustee for the Hershey trust estate.

It is apparent that the Geyer notes purchased by Kirk, trustee, from the Exchange Bank for the Hershey trust estate were of no value at the time they were purchased. Subsequent facts make certain what was quite apparent at that time. The question is: Was the investment by the appellee Kirk, as trustee of the Hershey trust estate, in the notes in question, an improper one, and such a breach of trust as to impose an obligation on the trustee making such investment to restore the trust funds diverted thereby? In determining that question the situation must be viewed as it should have appeared to a trustee of ordinary vigilance and diligence, in the position of the appellee Kirk, and knowing what he knew of the personal standing of Geyer, his business and financial activities and ability at the time, and the conditions under which the indebtedness evidenced by the notes were created. On the one side we have the fact that about the year 1917, before Geyer went into the army, during a brief experience of about two months, he was successful in business and made substantial profits. Further, that his character and reputation for honesty, integrity and fair

dealing were good at all times, and he was considered a good buyer and skilful in the handling of cattle. Although appellee Kirk, while stating that Geyer was honest and had a disposition to pay his debts, also stated he got out of the notion of paying them when he got away, but still expressed the view that when he took the notes he believed they would be paid. On the other side we have the fact that, at the time Geyer started doing business with the Exchange Bank, the profits he accumulated when he was in business some years before were evidently exhausted. He borrowed money to start a bank account, his business was not successful, and, in the short time he was doing business, a period probably not much over a year, he created the overdraft for which the notes were given. The bank had shut off his credit; believed he owed it enough; that he had nothing to pay the overdraft with; no property nor collateral. In extenuation of his act of taking the notes from Geyer without security, appellee Kirk testified: "Of course, you know they loaned money those days on character and worth in place of security. Sometimes they were lots better than some security we had." But the notes involved were not acquired in the ordinary or normal course of banking business as an evidence of a loan, but were acquired in settlement of an overdraft occasioned by losses incurred through unprofitable business transactions with which the managing officer of the Exchange Bank was familiar. Geyer was at that time an unmarried man, about 33 years of age, having no property interests there, and had left the community. The bank later, though not obligated on the $900 note, being indorsed "without recourse," paid that note out of the profits of the bank.

A trustee is not an insurer and is not absolutely bound for the results of his acts. As a general rule, the measure of care and diligence required of a trustee is such as would be pursued by a man of ordinary prudence and skill in the management of his own estate. 26 R. C. L. 1280, sec. 130. He must act honestly and faithfully, in

what he believes to be the best interests of the *cestui que trust*. He must exercise sound discretion. He is bound to proceed with diligence in investigating the nature of the proposed investment, and to use such care in deciding as, in general, prudent men of intelligence and integrity in such matters would employ in their own affairs when making a permanent investment in which the primary object is the preservation of the fund, and the secondary one that of obtaining an income therefrom. *In re Buhl's Estate*, 211 Mich. 124, 12 A. L. R. 569. If he invests in property, it ought to be property which yields an actual income, and which has a valuation in the general sense of the community, founded on that income, and not on remote eventualities and a succession of contingencies. 26 R. C. L. 1307, sec. 161.

Appellee Kirk directs attention to the provisions of the Hershey will, which provides: "It being my intention that the said trustee, in the management of the said trust estate and in its investment and reinvestment shall have as complete power to select investments as I would or might have had if I had remained living. * * * And said trustee shall not be personally liable with respect to any matter or thing done under any of the provisions of this will unless it (he) shall be guilty of negligence in the premises." And in the brief it is urged: "All that the trustee is required to do under this will is to act honestly and with ordinary discretion." But the discretion to be exercised under such circumstances in the execution of the trust must be a reasonable and not an arbitrary discretion. *In re Allis' Estate*, 191 Wis. 23; *Pabst v. Goodrich*, 133 Wis. 43. If any discretion was exercised in the purchase of the notes in question, it was, under the facts in this case, an arbitrary one. It seems clear that the notes involved in this case, at the time they were purchased for the estate, had no value according to the usual and ordinary tests; apparently the maker had no further credit there; he had no property; he had left that community and was reported to have gone to an-

other state. Kirk had knowledge of this situation. The purchase of the notes was a mere adventure, the value of which was contingent upon being able to locate the maker, the possibility of his having accumulated property out of which the indebtedness could be made, and his willingness or ability to pay. The conclusion is that the appellee Kirk, as trustee for the Hershey trust estate, in the purchase of said notes and the payment therefor out of the funds of the trust estate, did not exercise such diligence in the care and management of said trust estate as a man of prudence and discretion in such matters would ordinarily employ in his own affairs, and that his failure so to do was negligence, and such a breach of trust as to impose an obligation upon him to restore to the trust estate the funds diverted thereby.

At the time appellee Exchange Bank sold to Kirk, as trustee of the Hershey trust estate, the notes involved herein, and received in payment funds belonging to said trust estate, Ira A. Kirk was the president, a principal stockholder, and the active managing officer of said bank, and acted for the bank in that transaction. Knowledge of such president and active managing officer as to the trust character of such funds was therefore imputed to the bank. *State v. Citizens Bank,* 125 Neb. 882; *State v. Bank of Otoe,* 125 Neb. 414.

The bank, through its president and active managing officer, having participated in the wrongful conversion of the trust fund, and said trust fund being traced into the bank, where it was mingled with and augmented and enhanced its general mass of assets, it is chargeable as a constructive trustee with the duty of accounting to the trust estate for the funds so wrongfully converted, and a trust should be impressed upon all of the assets of said bank; that is, the assets under the direct control of the bank and also those in the control of the appellee S. L. Leas, trustee, to the extent of the balance not heretofore paid nor refunded to said trust, and interest, superior to any claim or lien of depositors and creditors. *State v. Bank*

*of Otoe,* 125 Neb. 414; *State v. Farmers State Bank,* 121 Neb. 532; *State v. Dwight State Bank, ante,* p. 388.

The reorganization of the Exchange Bank after the date of the transactions involved herein did not affect the rights and liabilities of the parties. While new stockholders were secured and new officers were in charge, the bank was operating under the same charter and articles of incorporation, and under the same name. Further, such change of stockholders and reorganization does not estop the trustee of a trust fund, received by the bank prior to its reorganization, from recovering the same from the bank as reorganized.

The assets in the possession or control of S. L. Leas, as trustee of certain depositors, are still the assets of the bank, though held by him as trustee for the depositors' committee for a specific purpose. However, the contract offered in evidence, under which S. L. Leas is holding the assets, makes provision for just such a contingency as here exists. Leas also testified to that effect. The claims of the depositors and creditors are inferior to the claim of the plaintiff for the trust funds of the Hershey estate. The trust funds never became the property of the bank, and are not assets to which the depositors and creditors would be entitled. *State v. State Bank of Touhy,* 122 Neb. 582.

The appellees contend that appellant should have brought an action at law and not in equity, and that they were entitled to a jury trial. Under the facts involved in this case the appellant, as the succeeding trustee of said trust fund, had an election of remedies. *Robinson v. Tower,* 95 Neb. 198. It is apparent that an action at law would not have been as effective as an action in equity. The trust fund having been mingled with the general mass of bank assets which were thus augmented and enhanced, resort may be had in equity to impress thereon a preferred claim payable from such general mass of bank assets. *State v. Farmers State Bank,* 121 Neb. 532.

Appellees further contend that appellant should be re-

quired to look first for the satisfaction of its claim to a mortgage given by Ira A. Kirk before proceeding with this action. On February 5, 1930, on order of the county court, made on the application of Ira A. Kirk, the said Kirk executed to the "county judge of Buffalo county, Nebraska, and to his successors in office, and to Ira A. Kirk as trustee in trust under the will of Frank Hershey, deceased, and to his successors in trust" a certain real estate mortgage, to secure said trust against any losses on account of the trust funds aggregating $79,604.32; $15,660.65 thereof being due from Kirk personally. It is stipulated that no notice was given to any one other than Ira A. Kirk of the hearing on the petition for the execution of said mortgage. There is some contention as to the value of the real estate covered by the mortgage; but we do not consider that material in this case. The provisions of the mortgage are not in the usual or ordinary form, but are complicated and involved. Regardless of the value of property, it is quite apparent, under the conditions of the mortgage, that the time when it might be enforced, if at all, would be problematical. While not expressing an opinion as to the validity of that mortgage, we conclude that its acceptance by the county judge is no bar to the pursuing of the remedy adopted by the appellant in this case.

The investment was made by Kirk in the Geyer notes aggregating $2,900. Plaintiff in its petition pleads that a note of Geyer for $1,000, in which no payee was designated, was through inadvertence delivered in lieu of a $900 note. The $900 note was not produced at the trial. The amount of the consideration paid for the notes, $2,900, is not controverted. There is no satisfactory explanation as to how the $1,000 note, which is without a payee, got into the possession of the plaintiff, though it is indorsed the same as the others. But the inability to produce the $900 note is accounted for by the evidence of Ira A. Kirk, who testified that several years later, about 1928, after he began to think the note was probably not good,

he took from the profits of the bank the amount of this $900 note and credited it to the Hershey trust fund, and that the $900 note was taken up by the Exchange Bank (not by Geyer) at the time. There is no evidence to contradict this testimony, except that Kirk in his report, exhibit No. 21, dated February 5, 1930, lists the Geyer notes as $3,000. This may be accounted for by the party making up the report for Kirk, finding the $1,000, no payee note, with the other notes produced on the trial. We conclude that the estate was refunded or paid by the Exchange Bank the amount invested in the $900 note. The finding of this court is that the appellant, First Trust Company, of Lincoln, Nebraska, recover from the appellees, Ira A. Kirk, Exchange Bank, Gibbon, Nebraska, and S. L. Leas, trustee, the sum of $2,000, with interest at the rate of 7 per cent. per annum from the 18th day of October, 1923, and that the amount so found due be impressed as a trust and lien upon all the assets of said bank in the possession and control of said bank, and S. L. Leas, trustee. Judgment and decree of the trial court reversed, and judgment and decree will be entered in this court on the foregoing finding, and for costs, and the cause is remanded to the district court, with directions to carry into effect the judgment and decree of the supreme court.

REVERSED.