NORTHERN BANK, A NEBRASKA BANKING CORPORATION, APPELLEE, v. FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER, APPELLANT.
496 N.W.2d 459

Filed March 5, 1993.   No. S-90-407.

Chip Lowe, of Adams, Howe & Zoss, P.C., and Ann S. DuRoss, Joan E. Smiley, and E. Whitney Drake for appellant.

Steven J. Woolley, of Polack, Woolley & Forrest, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

The plaintiff-appellee, Northern Bank, a Nebraska banking corporation, participated in loans which were arranged by another Nebraska banking corporation, Fairfield State Bank, for the latter's customer, the borrower Fairfield Nonstock Co-op Fertilizer Association. The defendant-appellant, Federal Deposit Insurance Corporation (FDIC), an instrumentality of

the government of the United States, subsequently became the receiver of the assets and liabilities of Fairfield Bank. The FDIC in effect treated the Co-op's loan repayments to Fairfield Bank as belonging to that bank. Northern Bank claims that as it was the participating bank, the repayments belonged to it. The district court so found and entered judgment in favor of Northern Bank, together with prejudgment interest. The FDIC assigns four claims of error, which merge to assert that the district court (1) mistakenly found the repayments to be assets of the participant Northern Bank, rather than assets of the lead Fairfield Bank, and (2) incorrectly awarded Northern Bank prejudgment interest on its claims. We affirm.

## II. BACKGROUND

The record reveals that a "participated loan" arises under an agreement in which one bank, known as the lead bank, transfers a loan it has arranged, or a part thereof, to a second bank, known as the participating bank. The participated loan device is intended to create in the borrower the illusion that it is the lead bank which is making the loan. For that reason it is used whenever the lead bank cannot or does not wish to lend its own funds, but nonetheless wishes to keep the borrower as a potential customer for other banking services. When a participated loan is transferred without recourse against the lead bank, which is the situation in this case, the participating bank assumes the credit risk, that is, the risk of the borrower's repayment or default.

The lead bank is responsible for gathering and passing credit information on to the participating bank, for securing the proper loan documentation, and for collecting the repayments made by the borrower. The lead bank typically receives compensation as the result of the "spread," that is, the difference between the rate of interest charged the borrower by the lead bank and the lesser rate of interest the participating bank is to receive.

Fairfield Bank had been suffering from problem loans, inadequate capital, and illiquidity for some time. By 1985, it had outstanding loans of its own funds totaling more than $5.5 million against total deposits of less than $7 million. Because

the demands for credit by its customers exceeded the amount of its deposits, it had, in addition, over $7.3 million of participated loans in which it was the lead bank.

In the wintertime the Co-op typically built up a checking account balance, that is, a demand deposit balance, of several hundred thousand dollars. In the spring, it borrowed money from Fairfield Bank on 3- to 6-month notes, and using the money it was paid for the goods and services it provided its members, it usually repaid its loans ahead of schedule.

After an FDIC examination in May 1985, a demand was made upon the shareholders of Fairfield Bank to inject more capital to insure the financial integrity of the bank. The shareholders were either unable or unwilling to do so, and, as a result, Fairfield Bank was closed by the Nebraska Department of Banking at 2 p.m. on May 31, 1985. The FDIC was then appointed as receiver of the bank's assets and liabilities.

### III. SCOPE OF REVIEW

As becomes apparent from the remainder of this opinion, a number of scopes of review come into play.

The matter of what law controls, treated hereinafter in part V, is in large part resolved by statute. Statutory interpretation is a matter of law in connection with which we, as an appellate court, have an obligation to reach an independent correct conclusion irrespective of the determination made by the trial court. *Curry v. State ex rel. Stenberg, post* p. 695, 496 N.W.2d 512 (1993).

The analysis of the FDIC's summarized assignments of error, treated in part VI, involves both contracts and constructive trusts. As is the case with the interpretation of statutes, the construction of a contract is also a matter of law subject to the same standard of review. *Baker v. St. Paul Fire & Marine Ins. Co.*, 240 Neb. 14, 480 N.W.2d 192 (1992); *Spittler v. Nicola*, 239 Neb. 972, 479 N.W.2d 803 (1992). However, the constructive trust aspects of the case sound in equity. *Vejraska v. Pumphrey*, 241 Neb. 321, 488 N.W.2d 514 (1992). In an action in equity, an appellate court tries the factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a

material issue of fact, the appellate court will consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Speidell Monuments v. Wyuka Cemetery, ante* p. 134, 493 N.W.2d 336 (1992).

## IV. TRANSACTIONAL FACTS

### 1. The Loans

The case at hand involves two participated loans arising under agreements, each denominated a "Certificate of Participation," in which Fairfield Bank as the lead bank and Northern Bank as the participating bank covenanted, in relevant part, that:

> [Northern Bank] is entitled to participation in said loan to the extent of the principal amount of such contribution, plus interest thereon at the rate of . . . per cent per annum from [date]. . . .
>
> The said obligation and any security or enforcement rights in connection therewith, of any nature whatsoever, are held and will be enforced and disposed of by [Fairfield Bank] for its benefit and the benefit of the holders of this and like certificates, representing in the aggregate the principal of said loan, and the holders of this and other like certificates are entitled respectively to a pro rata share of the proceeds of any and all payments made on account of the principal or interest of said loan, after deducting therefrom all expenses incurred in connection with the collection of said loan, foreclosure of any liens or security interests given to secure the same, and the sale or other disposition of said collateral.
>
> [Fairfield Bank], by issuing this certificate, makes no representation or warranty as to the collectibility of the loan, and while [Fairfield Bank] agrees to use the same degree of care in servicing said loan as would if said loan had been made for its own sole account, the holder hereof, by accepting this certificate, releases [Fairfield Bank] from any and all liabilities in connection with the above loan except the proportionate distribution of the funds received by [Fairfield Bank] for such distribution as above

provided.

### (a) First Loan

The first loan arose from a transaction which began on April 22, 1985, when Northern Bank advanced $200,000 on a loan Fairfield Bank had arranged for the Co-op, which was evidenced by a promissory note payable to Fairfield Bank in the amount of $200,000, bearing interest at the rate of 13.75 percent per annum. On the same day, the two banks executed the first of the described participation agreements, which gave Northern Bank the right to all of the principal amount of the loan at an interest rate of 12.5 percent.

On May 30, 1985, the Co-op issued a check in repayment of the loan, which was drawn on and was payable to Fairfield Bank in the amount of $202,863.01, the total amount of principal and interest which had accrued under the aforedescribed note. In exchange, Fairfield Bank stamped the note paid and returned it to the Co-op. As the repayment had been made by a check drawn on the Co-op's checking account with Fairfield Bank, the bank, on that same day, charged the amount of the repayment against the Co-op's checking account, thereby reducing Fairfield Bank's demand deposit liability to the Co-op by $202,863.01.

Because Fairfield Bank needed liquidity to assure that its checks would clear, it had borrowed $500,000 from the then First National Bank, Lincoln, Nebraska, where Fairfield Bank maintained an account. On the same day that the Co-op repaid its loan, Fairfield Bank requested that the Lincoln bank "wire" transfer, in effect immediately, $202,671.24 to Northern Bank and charge that amount against Fairfield's account, but the Lincoln Bank chose not to honor the request. (The difference between the amount of the requested transfer and the amount of the repayment constituted the servicing fee Fairfield Bank was entitled to receive for the services it had performed as the lead bank.)

### (b) Second Loan

The second loan arose from a transaction commenced on April 26, 1985, when Northern Bank advanced $100,000 on another $200,000 loan Fairfield Bank had arranged for the

Co-op. The loan was evidenced by a promissory note payable to Fairfield Bank in the amount of $200,000, bearing an interest rate of 13.75 percent per annum. On the same day, Northern Bank and Fairfield Bank executed the second of the participation agreements referred to in part IV(1)(a), which entitled Northern Bank to a $100,000 participation in the loan, at an interest rate of 12.5 percent. (Another bank participated on the remaining half of the loan.)

On May 31, 1985, the Co-op issued a check drawn on and payable to Fairfield Bank in the amount of $100,000. In exchange, Fairfield Bank placed a written notation on the face of the note acknowledging receipt of the $100,000. On the same day, Fairfield Bank charged the $100,000 check against the Co-op's checking account, thereby reducing Fairfield Bank's demand deposit liability to the Co-op by a like amount.

Prior to being closed on May 31, Fairfield Bank as remitter issued a cashier's check for $100,000 payable to the order of Northern Bank, which Northern Bank received after Fairfield Bank had been closed. When Northern Bank presented the check for payment, the FDIC refused to honor it. However, on December 15, 1985, the FDIC paid Northern Bank the $100,000. The bank accepted the payment in partial satisfaction of its claim under an agreement whereby the FDIC acknowledged that Northern Bank preserved whatever other rights it might have.

## V. CONTROLLING LAW

Before proceeding further, we must determine what law controls the resolution of this case. Neb. Rev. Stat. § 8-703 (Reissue 1991) provides, in relevant part:

> The [FDIC when acting as a receiver or liquidator] . . . shall have and possess all the powers and privileges provided by the laws of this state with respect to a receiver or liquidator respectively of a banking institution, its depositors and other creditors, and be subject to all the duties of such receiver or liquidator except insofar as such powers, privileges or duties are in conflict with the provisions of subsection (1) of section 12B of the Federal Reserve Act, as amended . . . .

Likewise, Neb. Rev. Stat. § 8-704 (Reissue 1991) reads that where the FDIC pays insured deposits, irrespective of whether it acts as receiver or liquidator, it becomes subrogated to the rights of the paid depositors, as set forth in the Federal Reserve Act, "[p]*rovided,* that the rights of depositors and other creditors of such closed institution shall be determined in accordance with the applicable provisions of the laws of this state."

In like fashion, 12 U.S.C. § 1819 (1988) specifies that the laws of the United States shall control all suits in which the FDIC sues or is sued,

> except that any such suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State law shall not be deemed to arise under the laws of the United States.

12 U.S.C. § 1821(e) (1988) is consistent, declaring that with respect to an insured state bank, when the FDIC acts as a receiver, it "shall possess all the rights, powers and privileges granted by State law to a receiver of a State bank."

Federal courts have held that under §§ 1819 and 1821(e), federal jurisdiction was lacking in actions involving the FDIC as receiver dealing with the rights or obligations of depositors, creditors, and stockholders. *Federal Deposit Ins. Corp. v. Sumner Fin. Corp.*, 602 F.2d 670 (5th Cir. 1979); *Federal Deposit Ins. Corp. v. National Surety Corp.*, 345 F. Supp. 885 (S.D. Iowa 1972).

However, where the FDIC acts in its corporate capacity rather than as receiver, federal law controls, as such suits are not subject to the state law exception of §§ 1819 and 1821(e). *Federal Deposit Ins. Corp. v. Bank of America*, 701 F.2d 831 (9th Cir. 1983), *cert. denied* 464 U.S. 935, 104 S. Ct. 343, 78 L. Ed. 2d 310 (applying state common law although FDIC acted in its corporate capacity, since no federal law was directly applicable); *First Western Federal Sav. Bank v. FDIC*, 678 F. Supp. 224 (D.S.D. 1988).

Inasmuch as in this case the FDIC acted as the receiver of Fairfield Bank, a state bank, the issues presented are controlled by the law of this state.

## VI. ANALYSIS

Having settled upon the scopes of our review and the law applicable, and having detailed the transactions in question and the background against which they arose, we proceed to a consideration of the FDIC's summarized assignments of error.

### 1. OWNERSHIP OF REPAYMENTS

As noted in part I, in the first summarized assignment of error the FDIC asserts that the district court mistakenly found the repayments to be the assets of Northern Bank rather than the assets of Fairfield Bank.

Relying on the diverse contractual language found in the various participation agreements, the widespread majority of cases holds that the participated loan device results in the sale of the designated percentage of the loan to the participating bank with the lead bank acting as the participant's agent to collect and forward the appropriate repayments and to service the loan. However, the participant does not acquire full legal title to the loan and attendant documents; such title rests in the lead bank. See, generally, *McVay v. Western Plains Corp.*, 823 F.2d 1395 (10th Cir. 1987); *Interfirst Bank Abilene v. Federal Deposit Ins.*, 777 F.2d 1092 (5th Cir. 1985); *Hibernia Nat. Bank v. Federal Deposit Ins. Corp.*, 733 F.2d 1403 (10th Cir. 1984); *Franklin v. C.I.R.*, 683 F.2d 125 (5th Cir. 1982); *Federal Deposit Ins. Corp. v. Mademoiselle of California*, 379 F.2d 660 (9th Cir. 1967); *Chase Manhattan Bank, N.A. v. F.D.I.C.*, 554 F. Supp. 251 (W.D. Okla. 1983); *Holcomb State Bank v. FDIC*, 180 Ill. App. 3d 840, 536 N.E.2d 453 (1989); *First Bank of WaKeeney v. Peoples State Bank*, 12 Kan. App. 2d 788, 758 P.2d 236 (1988).

As written in *Hibernia Nat. Bank v. FDIC, supra*, "The lead is the only secured party. The 'participants' can look solely to the lead for satisfaction of their claims because they are not themselves creditors of the borrowers and cannot assert creditor claims against the borrowers." *Id*. at 1407.

In the final analysis, the terms of the participation agreement govern the relationship between the lead and participating banks. *Franklin v. C.I.R., supra*. The agreements in this case make clear that Northern Bank advanced the funds in question;

that as to Northern Bank each participation was without recourse against Fairfield Bank; that while the notes and attendant documents named Fairfield Bank as the payor, they were executed to secure Northern Bank's interests and Fairfield Bank thus, to the extent of those interests, held the documents for the benefit of Northern Bank; and that Northern Bank was to receive the proceeds in the proportions that the funds it had advanced bore to the total amounts of the loans.

That Fairfield Bank held the repayments in constructive trust for Northern Bank is illustrated by *State, ex rel. Sorensen v. Farmers State Bank*, 121 Neb. 532, 237 N.W. 857 (1931). Therein, the borrower was obligated to the bank on a $4,500 promissory note he executed to discharge and renew an earlier note which, unknown to him, the bank had sold. The bank sold the second note as well, but rather than using the funds so produced to pay off the borrower's earlier note, it used the funds for its own purposes and dissipated them before it was closed and a receiver appointed.

The *Farmers State* court held that under the circumstances, the borrower entrusted the second promissory note to the bank for the sole purpose of discharging the earlier note. Although there was no express written trust, the court held the bank was essentially a constructive trustee, stating:

> The bank thus became a trustee to pay the original note with the renewal note and to return the former note to the [borrower]. . . . The bank never acquired [the borrower's] title nor a right to use his credit or proceeds or money in the banking business. In equity his converted property was never a bank asset to which depositors had a right to resort for payment of their general deposits.

*Id.* at 534-35, 237 N.W. at 858.

As this court has since noted:

> A constructive trust is imposed when one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property. In such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof.
>
> . . . .

"A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his acquisition or retention of the property would constitute unjust enrichment."

*Gottsch v. Bank of Stapleton*, 235 Neb. 816, 825-26, 458 N.W.2d 443, 450 (1990).

This so-called "swollen assets" or "augmentation of assets" doctrine was also applied in the following cases: *State, ex rel. Sorensen v. State Bank of Touhy*, 122 Neb. 582, 240 N.W. 925 (1932) (granting an obligor on a refinanced note a preferred claim for funds not forwarded to pay off the first note, as in *Farmers State*); *State, ex rel. Sorensen v. Beemer State Bank*, 123 Neb. 231, 242 N.W. 445 (1932) (denying relief where customer had knowledge that the bank used the bonds in question as general assets of the bank); *State, ex rel. Sorensen v. Citizens State Bank*, 124 Neb. 562, 247 N.W. 345 (1933) (granting a preferred claim for loan repayments received by the failed bank to the assignee of the note). See, also, *State, ex rel. Sorensen v. South Omaha State Bank*, 129 Neb. 43, 260 N.W. 815 (1935); *State, ex rel. Sorensen v. Nebraska State Savings Bank*, 128 Neb. 479, 259 N.W. 46 (1935); *State, ex rel. Sorensen v. Fidelity State Bank*, 127 Neb. 529, 255 N.W. 781 (1934); *First Trust Co. v. Exchange Bank*, 126 Neb. 856, 254 N.W. 569 (1934); *Davis v. Polak*, 126 Neb. 640, 254 N.W. 246 (1934); *State, ex rel. Sorensen v. Commercial State Bank*, 126 Neb. 490, 253 N.W. 647 (1934); *State, ex rel. Sorensen v. Dwight State Bank*, 126 Neb. 388, 253 N.W. 410 (1934); *State, ex rel. Sorensen v. Bank of Otoe*, 125 Neb. 383, 250 N.W. 254 (1933); *State, ex rel. Sorensen v. Citizens Bank*, 124 Neb. 717, 248 N.W. 82 (1933).

The FDIC nonetheless argues that *State, ex rel. Sorensen v. Nebraska State Savings Bank*, 127 Neb. 832, 257 N.W. 64 (1934), controls. We therein held that book entries shifting assets between two related banks, both of which failed, did not serve to augment the funds of the related bank with which the borrower had dealt. However, the situation presented in *Nebraska State* is quite different from that presented in the case at hand. In *Nebraska State*, the claimant was unable to show

that any of the assets were actually transferred from one bank to the other; rather, the entries were made merely "for the purpose of bolstering up the reserve" of one of the related banks. *Id.* at 835, 257 N.W. at 65. Here, Fairfield Bank actually received funds which reduced its deposit liabilities and loan receivables and left an unrealized obligation to Northern Bank.

We thus hold that the participation agreement in question effectuated a sale by Fairfield Bank to Northern Bank of all of the first loan and half of the second loan. However, legal title to the promissory notes and related documents remained in Fairfield Bank, who as lead bank acted as an agent for Northern Bank in servicing the loan; as such, Fairfield Bank served merely as a conduit between the Co-op and Northern Bank. As a consequence, the repayments never became assets of Fairfield Bank; it merely held the repayments in constructive trust for the benefit of Northern Bank.

Accordingly, the district court correctly determined that the repayments were assets of Northern Bank.

## 2. PREJUDGMENT INTEREST

We thus reach the second and last assignment of error, which, as first noted in part I, claims that in any event, the district court erred in awarding Northern Bank prejudgment interest on the amount of its claims.

The district court awarded Northern Bank prejudgment interest at the contract rate on its claim under the first loan from the date it advanced its money to the date of judgment. It also awarded prejudgment interest at the contract rate on the money it advanced for the second loan to December 15, 1985, when the FDIC reimbursed Northern Bank as described in part IV(1)(b). That interest amounted to $6,780.83, on which amount the district court also ordered prejudgment interest at the contract rate.

The FDIC argues that under *Department of Banking v. Elm Creek State Bank*, 205 Neb. 323, 287 N.W.2d 440 (1980), no claim for interest may arise until there is a surplus above all claims, which is not the situation in this case. However, in *Elm Creek*, the claimant was a stockholder of the closed bank, not a preferred claimant, as is Northern Bank. As the court in *Elm*

*Creek* noted: "Whether interest on preferred claims could have been paid prior to payment of general claims is not here argued or decided." *Id*. at 324, 287 N.W.2d at 442.

The FDIC further argues that under federal law claimants are not entitled to prejudgment interest against the FDIC. In support of that proposition it cites *Marchese v. U.S.*, 781 F. Supp. 241 (S.D.N.Y. 1991) (holding that the FDIC in its corporate capacity is not required to pay interest to insured deposit holders), and *Far West Federal Bank v. Director, OTS*, 787 F. Supp. 952 (D. Or. 1992), *aff'd, Far West Federal v. Office of Thrift Supervision*, 930 F.2d 883 (Fed. Cir. 1991) (denying prejudgment interest of investors of a failed thrift against the office of thrift supervision).

The FDIC's immunity from prejudgment interest was also discussed in *Philadelphia Gear Corp. v. Federal Deposit Ins.*, 751 F.2d 1131 (10th Cir. 1984), *reversed on other grounds* 476 U.S. 426, 106 S. Ct. 1931, 90 L. Ed. 2d 428 (1986), in these terms:

> Absent an express waiver, sovereign immunity bars suit against the United States government or its agencies. By statute, 12 U.S.C. § 1819, the FDIC has the capacity to sue and to be sued. But that does not waive the sovereign immunity doctrine on claims for prejudgment interest. . . . The FDIC insurance statute . . . permits delays in paying insurance when the FDIC is in doubt about the validity of a claim to insurance proceeds: [quotation from the statute]. Thus, Congress expressly recognized that delays would occur in paying some insurance claims, yet it did not expressly waive its immunity to prejudgment interest. Under those circumstances we must hold that prejudgment interest should not have been awarded on the claims for insurance proceeds.

*Id*. at 1138-39.

However, in the foregoing cases the FDIC and the office of thrift supervision were acting in their corporate capacities rather than as receivers, a significant distinction established in part V of this opinion.

Here, the claim is against the FDIC for the return of assets not rightfully a part of the receivership. In that circumstance,

Northern Bank has a right to recover prejudgment interest at the contract rate on its liquidated claims. *Graff v. Burnett,* 226 Neb. 710, 414 N.W.2d 271 (1987); *Lease Northwest v. Davis,* 224 Neb. 617, 400 N.W.2d 220 (1987); *Edquist v. Commercial Sav. & Loan Assn.,* 191 Neb. 618, 217 N.W.2d 82 (1974).

## VII. JUDGMENT

The record failing to sustain either of the summarized assignments of error, the judgment of the district court is affirmed.

AFFIRMED.