ROBERT D. MOUSEL, JR., APPELLEE AND CROSS-APPELLANT, V. ARTHUR A. DARINGER, APPELLANT AND CROSS-APPELLEE, STATE SECURITIES COMPANY, A CORPORATION, INTERVENER-APPELLANT AND CROSS-APPELLEE.

206 N. W. 2d 579

Filed April 6, 1973. No. 38633.

Herman Ginsburg and Ginsburg, Rosenberg, Ginsburg & Krivosha, for appellants.

Eisenhart & Eisenhart, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

SMITH, J.

The issues relate to priority of interests between an agister and a secured party and to liability of the agister for damage. The District Court, sitting in equity, found for the agister on his claims but against him on the

damage claim. It accordingly decreased the amount of the judgment for the agister by the amount of damages awarded. The agister's lien was adjudged superior to the security interest which concededly had been perfected. The secured party, State Securities, appeals, and the agister, Robert D. Mousel, Jr., cross-appeals.

## SUMMARY OF RECORD

On May 1, 1968, Mousel agreed in writing to sell his registered Hereford cattle to Arthur A. Daringer. The agreement described 5 groups: (1) 100 cows; (2) 32 heifers, age 4, with 15 calves at side; (3) 25 heifers, age 2; (4) 20 bulls; and (5) 79 bull and heifer yearling calves. Darlinger on or before November 1, 1968, was to demand possession of groups 1, 4, and 5, and to pay the price. The price of groups 2 and 3 was paid on the date of the agreement, and those animals, except the 15 calves, were delivered to Daringer. Daringer was to be entitled to possession of the calves upon request. The unpaid balance of the purchase price was $58,000.

Mousel also agreed to take reasonable care of the animals in his possession without charge until June 1, 1968. After that date Daringer was to pay the feed bill monthly to the time he claimed the animals from Mousel.

On March 31, 1969, Daringer in consideration of the loan of the $58,000 executed and delivered a note, financing statement, and security agreement to State Securities. The statement and agreement were filed in Thayer County, where Daringer resided, on April 1, 1969, at 8 a.m.

On April 1, 1969, Daringer notified Mousel that he desired to claim the animals and to pay the balance of the purchase price. That evening they tentatively computed the charges for the feeding of the cattle to date. They intended within a few days to evidence the obligation by a note and security agreement. Daringer then handed Mousel a check for $58,000 drawn by State Securities and payable to Mousel for Daringer. Mousel

retained possession of the animals in Frontier County, where he lived.

In April 1969, Mousel and Daringer (1) recomputed the feed bill to May 1, 1969; and (2) agreed that Mousel would release all the animals except 90 cows in group 1, the 90 cows representing security for payment of the feed bill. The charge, $18,523, was fair and reasonable. Daringer delivered his promissory note payable to Mousel in the sum of $18,523, with interest at the rate of 7% a year to maturity and 9% thereafter. The note was payable in installments of $5,000, $5,000, and $8,523 respectively on July 15 and October 15, 1969, and January 1, 1970. A financing statement was signed and recorded in Frontier County. The only payment made on the note was $5,000 on January 7, 1970. As to Mousel's first cause of action, that rests on the note, in the foreclosure suit Mousel alleged that (1) the credit on principal was $4,136, $864 of the payment representing interest; (2) the principal with interest at 9% a year from maturity to date totaled $15,325; and (3) the total ought to bear interest at 9% a year until paid. The court allowed Mousel's claim on the note in full.

By agreement in the fall of 1969 Mousel had retained possession of the cattle, and he continued to feed them until October 30, 1970. His charges, which formed the basis of his second cause of action, $14,693.10, were fair and reasonable, and the court accordingly rendered judgment for Mousel. It found that both claims took priority over the security interest of State Securities.

On the other claim the District Court found no proof that a 90% breeding standard was "common or ordinary even in the breeding of pure bred livestock . . . ." It also found Mousel liable for damage of $8,320 "to the 1969, 1970 and 1971 calf crops," but it disallowed other items of the damage claim.

The evidence relating to the existence of an industry breeding standard of 90% is in conflict. In addition,

according to the testimony of Mousel, he could not obtain authority from Daringer to sell cows too old to bear calves. In the summer of 1970 he delayed the servicing of the cows because of doubt respecting Daringer's intentions to breed the cows with Mousel's bulls.

Other evidence tended to establish these facts: The old cows were capable of bearing calves. The delay of 1 month in the servicing of all the cows may have adversely affected the birth and condition of calves born in 1971. The calves were handled roughly in the seizure under the replevin. An appraiser testified to the good condition of the cattle at the time of the replevin. A neighbor testified that Mousel, whose herd was the "Cadillac" of Herefords, had taken as good, if not better, care of the herd after the sale to Daringer as he had done before the sale. A veterinarian testified to unsatisfactory care and feeding prior to the time he had seen the animals in late November 1970.

## ISSUES RAISED BY STATE SECURITIES

State Securities argues as follows: Its perfected security interest was prior in time and therefore superior to any agister's lien arising after April 30, 1969. Mousel waived his agister's lien existing prior to May 1, 1969, by taking the promissory note, filing the financing statement, and making subsequent feed agreements with Daringer. Rejection of the latter argument would allow a bailor and agister to agree upon terms unfair to a secured party who had already acquired his interest. The allowance of interest at the rates of 7% and 9% agreed upon in the promissory note is a case in point.

The meaning of two statutory provisions and their interaction are important. The provision for an agister's lien reads: "When any person shall procure, contract with, or hire any other person to feed and take care of any kind of livestock, the person so procured, contracted with, or hired, shall have a first, paramount and prior lien upon such property for the feed and care bestowed by him upon the same for the contract price

therefore, and in case no price has been agreed upon, then for the reasonable value of such feed and care, provided the holders of any prior liens shall have agreed in writing to the contract for the feed and care of the livestock involved . . . ." § 54-201, R. R. S. 1943.

The other statutory provision reads: "When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon the goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise." § 9-310, U. C. C.

The provision for an agister's lien is first examined apart from the Uniform Commercial Code. Once it is determined that a person is protected, the provision will be liberally construed so that its object will be effectuated. See, County Board of Platte County v. Breese, 171 Neb. 37, 105 N. W. 2d 478 (1960); Hoerler v. Prey, 125 Neb. 822, 252 N. W. 327 (1934); Becker & Degen v. Brown, 65 Neb. 264, 91 N. W. 178 (1902). The lien is statutory, although its basis is consensual. Becker & Degen v. Brown, *supra*. An agister's lien under a feeding contract in Hoerler v. Prey, *supra*, was superior to a subsequent chattel mortgage, although the bailor and agister extended the feeding period in accordance with the contract.

The lien of an agister may be waived. Hoerler v. Prey, *supra*. Waiver generally is the "intentional, voluntary, and understanding relinquishment of a known right." Dobbs, Law of Remedies, § 2.3, p. 43 (1973). See, also, Kilpatrick v. Kansas City & B. R. R. Co., 38 Neb. 620, 57 N. W. 664 (1894). The policy behind it is stability and conclusiveness. A party who waives his rights tells others in substance that he relinquishes his rights. "It is good policy in many situations to encourage such a reliance rather than to insist that affairs remain in flux. This is a very different matter

from estoppel, where the concern is reparative and ethical rather than politic. In estoppel cases, it is not the policy of encouraging reliance, but the policy of protecting against harmful reliance that has already occurred." Dobbs, *supra*.

" 'The mere taking of security for the amount of a debt for which (such) a lien is claimed does not ordinarily destroy the lien. To have this effect, there must be something in the facts of the case, or in the nature of the security taken, which is inconsistent with the existence of the lien and destructive of it.

" 'The taking of a mortgage upon the same property upon which the creditor claims a statutory lien, may not displace the lien. The mortgage is regarded as a cumulative security, and the creditor may enforce either the lien or the mortgage . . . .' " Kilpatrick v. Kansas City & B. R. R. Co., *supra*.

If the statute creating a lien in favor of persons who furnish services or materials with respect to goods subject to a security interest is silent on seniority, the lien takes priority over the security interest, although judicial interpretation has subordinated the lien to the security interest. See § 9-310, Comment 2, U. C. C.

A person who furnishes materials or service with respect to goods that are already subject to a perfected security interest is not engaged in the ordinary course of his business under § 9-310, U. C. C., with respect to any part of his charges that are unreasonable. Cf. 4 Anderson, Uniform Commercial Code, § 9-310:10, p. 345 (2d Ed., 1971); II Gilmore, Security Interests in Personal Property, § 33.5, p. 888; Notes and Comments, 76 Yale L. J. 1649 at 1654 (1967).

The argument of State Securities respecting the interest allowed by the District Court is well taken. Mousel and Daringer agreed upon the rates of 7% and 9% a year after perfection of the security interest, and the rates were unreasonable. The amount of the interest on the first cause of action must be recomputed on re-

mand in accordance with section 45-104, R. R. S. 1943, which prescribes the applicable interest rates. The charge of $18,523 for the agistment period to May 1, 1969, being reasonable, Mousel in that respect unquestionably acted in good faith. Inasmuch as he did not waive the lien, enforceability of the note against Daringer in this controversy is a moot question. Equity delights to do justice, and that not by halves.

The argument that Mousel possessed more than one agistment lien and that the first one alone took priority over the security interest is not sound. Mousel's statutory lien attached no later than June 2, 1968, and was prior in right.

LIABILITY OF MOUSEL FOR DAMAGE

No brief answering the cross-appeal of Mousel was filed. Absence of an answer brief and the condition of the record complicates our application of this general rule: On review de novo in equity of issues of fact we consider the opportunity of the trial court to resolve the issues by observing the witnesses.

We consider the opportunity of the trial court to observe the witnesses as much as we can fairly do so. Mousel justifiably delayed the servicing of the cows in 1970, and the duration of his lien under the circumstances did not affect the justification. The evidence does not persuade us that Mousel was negligent in taking care of or feeding the animals during the period in question.

CONCLUSION

The District Court erred in applying interest rates of 7% and 9% in computing the amount of Mousel's lien superior to the interest of State Securities. It also erred in decreasing the amount of Mousel's lien by the amount of the judgment for damages and in failing to dismiss the negligence claim against Mousel. The judgment is reversed and cause remanded with directions to render judgment in accordance with this opinion. Costs on appeal are taxed to State Securities.

REVERSED AND REMANDED WITH DIRECTIONS.