DENNIS GRAFF AND VELDA GRAFF, HUSBAND AND WIFE,
APPELLEES, V. GARY D. BURNETT, APPELLANT.

414 N.W.2d 271

Filed October 23, 1987.    No. 86-1037.

James L. Germer of Germer, Murray, Johnson & Germer, for appellant.

Daniel L. Werner of McKernan & Werner, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Dennis and Velda Graff commenced an action against Gary D. Burnett in the district court for Thayer County, seeking to foreclose an agister's lien, Neb. Rev. Stat. § 54-201 (Reissue 1984), and a stallion service lien, Neb. Rev. Stat. §§ 54-202 et seq. (Reissue 1984), occasioned by their oral agreements with

Burnett concerning his horses. Responding to Graffs' petition, Burnett filed an answer and then counterclaimed, alleging that Graffs wrongfully detained Burnett's horses after Burnett had tendered payment of the stud fee and feed bill for his mares. The district court awarded monetary judgments to Graffs and authorized foreclosure of the liens on the horses if Burnett defaulted in payment of the amounts awarded to Graffs. The district court found against Burnett on his counterclaim. We affirm.

. Dennis and Velda Graff own a horse-breeding farm and also sell horses. In the past, Gary Burnett, as an owner and dealer of horses, has had his mares serviced by stallions at Graffs' farm. During a conversation with Dennis Graff, Burnett expressed an interest in purchasing one of Graffs' mares, She's Rocky One, which Burnett offered to purchase on condition that Graffs breed She's Rocky One to one of their stallions, Skip A Hi, and keep She's Rocky One in a stall and on grain during her stay at Graffs' farm. Graffs agreed to a sale price of $2,250 for She's Rocky One and a stud fee of $500 for Skip A Hi. Also, Dennis Graff and Burnett discussed breeding two of Burnett's mares, Miss Tuff Cutter (also known as Tuffernhel) and Roan Spanish Miss, to Skip A Hi.

On July 6, 1984, Burnett brought his two mares, with a colt at the side of each, to Graffs' farm for breeding purposes. At that time Burnett and Dennis Graff orally agreed that Burnett's mares, Miss Tuff Cutter and Roan Spanish Miss, would be bred to Skip A Hi at a stud fee of $500 for each mare.

Pursuant to their oral agreements with Burnett, Graffs bred the three mares to their stallion. In mid-September 1984, Graffs notified Burnett that a veterinarian had verified the pregnancy of the mares. Burnett arrived at Graffs' place on October 16 to pick up his horses and, with Graffs, discussed payment for the services rendered at Graffs' farm. During that conversation, Graffs presented Burnett with the following itemized statement of charges for the horses:

| She's Rocky One | For purchase | $2,250 |
|---|---|---|
| | For care | 118 |
| | For stud services | 500 |

| | | |
|---|---|---:|
| Miss Tuff Cutter (Tuffernhel) | For care | 187 |
| | For stud services | 500 |
| Roan Spanish Miss | For care | 187 |
| | Total | $3,742. |

Burnett took out his checkbook and declared that he wanted to pay part of the bill, namely, the stud fee for Miss Tuff Cutter and the charges for feed and care for the two mares (Miss Tuff Cutter and Roan Spanish Miss). However, Burnett declined to pay any of his account regarding She's Rocky One. Therefore, Burnett was prepared to write his check for $687, pick up his two mares (Miss Tuff Cutter and Roan Spanish Miss), and leave She's Rocky One at Graffs' farm until a future payment for the purchased mare. Graffs demanded payment of the entire account, and, when the parties failed to reach a settlement of the account for the horses, Burnett left and never paid any part of the bill submitted by Graffs.

On November 8, 1984, Graffs filed a "Notice of Lien" for services of a stallion and an "Affidavit for Agister's Lien" in the office of the Thayer County clerk, which documents pertained to the care, feed, and stud services provided to the mares Miss Tuff Cutter and Roan Spanish Miss, their accompanying colts, and She's Rocky One.

Section 54-201(2), pertaining to an agister's lien, provides in pertinent part:

> When any person . . . whose residence or principal place of business is located outside the State of Nebraska shall procure, contract with, or hire any other person . . . within the State of Nebraska to feed and take care of any kind of livestock, the person so procured, contracted with, or hired shall have a first, paramount, and prior lien upon such property for the feed and care bestowed by him or her upon the same for the contract price agreed upon, and in case no price has been agreed upon, then for the reasonable value of such feed and care. . . . Prior to removal of such livestock from his or her premises, the person . . . entitled to a lien shall file in the office of the county clerk, in the county in which such livestock may be fed and kept, an affidavit describing the livestock and

setting forth the amount justly due for the feeding and keeping of the same.

Section 54-202 specifies a party's rights to be paid for stud service by that party's stallion: "Every owner, lessee, agent or manager of any stallion . . . shall have a lien upon any mare and her colt . . . served by such stallion . . . for the full amount of the reasonable or agreed value or price of such service."

In their petition, Graffs asserted two causes of action—count I relating to the stud fee (Miss Tuff Cutter) and care for the two mares (Miss Tuff Cutter and Roan Spanish Miss) and count II relating to She's Rocky One (purchase price, stud fee, and care). Burnett, in his counterclaim, alleged that Graffs wrongfully retained possession of the horses Miss Tuff Cutter and Roan Spanish Miss.

Graffs admitted that Burnett had offered to pay $687 on October 16 as part payment of the bill submitted. Graffs' evidence regarding reasonable charges, which was undisputed, showed feed and care for the mares Miss Tuff Cutter and Roan Spanish Miss—pasture at $1.50 per day for 79 days and grain feeding at $3 per day for 23 days, all of which included care and feed until October 17, 1984, when the daily rate charged for care of all horses became $15 per day. Dennis Graff then testified concerning the oral agreements and events involving Burnett and the Graffs, as previously reflected in this opinion. Dennis Graff further testified that Burnett had never remonstrated regarding the purchase of She's Rocky One and that all previous transactions with Burnett, before those in question, had been on a cash basis, a medium of payment prevalent in the horse-breeding business. As developed during Dennis Graff's testimony, on account of a prior transaction, there was a credit for Burnett, thereby resulting in the sum of $687 due for the mares which Burnett had brought to Graffs' farm.

Burnett testified that he was willing to pay the stud fee and other charges for Miss Tuff Cutter and Roan Spanish Miss, but admitted that he could not pay the purchase price for She's Rocky One. Concerning the conversation at presentation of Graffs' statement or bill, Burnett further testified that he was unwilling to write an insufficient-fund check for the entire

amount of his account, or, as explained by Burnett: "I said I could give you [Graffs] a hot check and run home and stop payment and then you're going to have to come down and get this mare or you're going to have to give me some time to make it right." Burnett also testified that Graffs would not allow removal of his bred mares and their colts unless Burnett paid for the entire bill, including the purchase price for She's Rocky One. In further testimony, Burnett stated that he had paid Graffs by check in the past, and the parties intended payment by check regarding the particular transactions involved in this case, as evidenced in a conversation with Velda Graff, who informed Burnett that the mares had been bred and Graffs "would like for you to send us a check." Burnett emphasized his willingness to pay $687 by his check payable to Graffs.

The district court awarded Graffs judgment for $687 on count I and $2,868 on count II, for an aggregate judgment in the amount of $3,555 with prejudgment interest from October 17, 1984, and a daily fee of $15 for care and feed of Burnett's horses after October 17. The judgment also authorized foreclosure of Graffs' liens on Burnett's default in payment of the amounts awarded in the judgments. Also, the district court found against Burnett on his counterclaim.

In his appeal, Burnett does not question the district court's judgment concerning count II or foreclosure of a possessory lien under § 54-201 and the lien prescribed by § 54-202. Consequently, we review no aspect of the judgment rendered on count II or the method of foreclosing the stallion service lien in the present case. However, Burnett contends that the trial court erred in (1) determining that Burnett had failed to tender payment to the Graffs, (2) awarding the Graffs excessive damages and prejudgment interest, and (3) denying relief on Burnett's counterclaim.

An action for determination of the amount of a lien, pursuant to § 54-201 or § 54-202, and foreclosure of such lien is an equity action. See *Mousel v. Daringer*, 190 Neb. 77, 206 N.W.2d 579 (1973).

> In an appeal of an equity action, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court,

provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See, Neb. Rev. Stat. § 25-1925 (Reissue 1985) . . . .

*Hughes v. Enterprise Irrigation Dist., ante* p. 230, 234, 410 N.W.2d 494, 497 (1987).

When the owner of livestock contracts with another to feed and care for the owner's livestock, § 54-201 provides the agister with a lien upon the stock for the agister's keeping, and the owner cannot lawfully obtain possession of the stock until the owner has paid or tendered to the agister the amount due for the feed and care. See, *Kroll v. Ernst*, 34 Neb. 482, 51 N.W. 1032 (1892); *Gates v. Parrott*, 31 Neb. 581, 48 N.W. 387 (1891). Burnett does not question a disposition of the stallion service lien, authorized by § 54-202, as a possessory lien similar to the agister's lien under § 54-201. The undisputed evidence establishes that Graffs provided feed, care, and stud services to Burnett's mares. Graffs notified Burnett that the mares were pregnant, as verified by a veterinarian. Under the circumstances and theories advanced by the parties, Graffs were entitled to the benefit of a lien for feed and care, see, *Stickell v. Haggerty*, 158 Neb. 34, 62 N.W.2d 107 (1954), *Kroll v. Ernst, supra*, and *Gates v. Parrott, supra*, and to the benefit of a lien for the services by their stallion, Skip A Hi. See § 54-202.

The evidence presents a conflict concerning the method of payment contemplated by the parties. On the one hand, Graffs' evidence supports a finding that cash was the only acceptable form of payment, while Burnett's evidence supports a finding that the parties contemplated Burnett's check as an acceptable payment. We conclude, as a factual determination, that Graffs and Burnett intended that payment might be made by Burnett's check. Recognizing that Graffs otherwise properly perfected their liens, we must next determine whether Burnett's offer to pay by check for the mare care and stud services which were the subject of count I is a tender of payment which discharged or extinguished the liens asserted by Graffs and, consequently,

eliminated foreclosure as a remedy available to Graffs.

One claiming an adequate and proper tender of payment has the burden to prove both the offer to pay and the present ability of immediate performance at the time of the tender. Cf. *Hanson v. Duffy*, 106 Ill. App. 3d 727, 435 N.E.2d 1373 (1982).

To determine whether a proper tender of payment has been made, we have stated that a tender is more than a mere offer to pay. A tender of payment is an offer to perform, coupled with the present ability of immediate performance, which, were it not for the refusal of cooperation by the party to whom tender is made, would immediately satisfy the condition or obligation for which the tender is made. See, *Mr. U Inc. v. Mobil Oil Corp.*, 197 Neb. 612, 249 N.W.2d 909 (1977); *Caha v. Nelson*, 195 Neb. 333, 237 N.W.2d 870 (1976). In *Mr. U Inc., supra,* we further concluded that a tender of payment is the offer of a sum of money to satisfy a debt and is made by presenting and showing such payment to the creditor and expressing a willingness to deliver that payment to the creditor. See, also, *Anson v. Grace*, 174 Neb. 258, 117 N.W.2d 529 (1962) (a sufficient tender requires a present and immediate ability to make the tender good). Similarly,

> "[a] mere offer to pay does not constitute a valid tender, the law requires that the tenderer have the money present and ready, and produce and actually offer it to the other party. Tender implies the physical act of offering the money or thing to be tendered, but this cannot rest in implication alone. The law requires an actual, present, physical offer; it is not satisfied by a mere spoken offer to pay, which, although indicative of present possession of the money and intention to produce it, is unaccompanied by any visible manifestation of intention to make the offer good."

*Owens v. Idaho First Nat. Bank*, 103 Idaho 465, 466-67, 649 P.2d 1221, 1222-23 (1982) (citing 74 Am. Jur. 2d *Tender* § 7 (1974)). Accordingly, although a tender of payment does not have to be in cash unless so demanded by the creditor, the tender must demonstrate an ability to carry out the terms of the contract. See *United States v. Allen*, 699 F.2d 1117 (11th Cir. 1983).

While the record does not reflect that Burnett actually wrote his check for payment and then delivered or offered to deliver that check to the Graffs, existence of such check is not necessary for resolution of the basic issue involved in this case. An additional absence in the record is more important and crucial in Burnett's appeal, namely, the absence of any evidence that Burnett, when he offered to pay by check, had sufficient funds on deposit at the bank on which such check would have been drawn. Although Burnett acknowledged that he would have to "run home and stop payment" of a check given to pay for the entire account at Graffs' farm, Burnett offered no evidence that he had sufficient funds deposited in his checking account to cover the check he would have delivered to Graffs. As a consequence of such absent evidence, Burnett failed in his burden to show that he had the present ability of immediate performance, an element required for an effective tender, when the claimed tender was made. See, *Mr. U Inc. v. Mobil Oil Corp., supra; Caha v. Nelson, supra.* Without tender of payment, Burnett did not satisfy the obligation underlying the liens on the horses, and Graffs' liens subsisted for disposition by the district court. Burnett's first assignment of error has no merit.

Burnett's second assignment of error alleges that the district court awarded the Graffs excessive damages and prejudgment interest. Graffs were entitled to retain possession of Burnett's horses until their agister's lien was satisfied. *Kroll v. Ernst*, 34 Neb. 482, 51 N.W. 1032 (1892); *Gates v. Parrott*, 31 Neb. 581, 48 N.W. 387 (1891). A party entitled to the benefit of an agister's lien may recover the reasonable value of the feed and care which are the bases of such lien. See § 54-201(2). See, also, *Stickell v. Haggerty*, 158 Neb. 34, 62 N.W.2d 107 (1954). Burnett has never disputed the reasonableness of the charges for the horses' feed and care at Graffs', as well as stud fees for the horses. The district court's judgment for $687 is supported by the evidence, and Burnett's claim that the court awarded excessive damages is without merit.

Burnett further contends that the district court should not have awarded prejudgment interest. In *Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 131, 317 N.W.2d 900, 905 (1982),

we stated:

> Prejudgment interest is allowable only when the amount of the claim is liquidated. Neb. Rev. Stat. § 45-104 (Reissue 1978). Where a reasonable controversy exists as to the plaintiff's right to recover and as to the amount of such recovery, the claim is generally considered to be unliquidated and prejudgment interest is not allowed.

Burnett has not disputed the agreements involving the horses. At trial, Burnett did not take issue with the reasonableness of Graffs' charges for the services rendered. Additionally, on appeal, Graff concedes that "$500 was the agreed upon figure for stud fees" and "the fees for mare care and feed through October 16, 1984, were considered reasonable by the parties." Brief for Appellant at 8. Therefore, there was no controversy concerning Graffs' right to recover on their agreements with Burnett for mare care. By applied horsesense, the amount of such recovery is ascertained through the somewhat elementary process of multiplying the daily rate for care times the number of days on which the care was received, plus $500 for the stud fee, which produces the uncontroverted and liquidated sum of $687. There is no merit to Burnett's contention that prejudgment interest is not allowable under the circumstances.

In his final assignment of error, Burnett contends that the district court erred in denying his counterclaim for conversion and in failing to award him damages resulting from Graffs' wrongful detention of the horses. As we have previously stated, Graffs were entitled to retain possession of Burnett's horses until Graffs received a proper tender of payment. Because Burnett never tendered payment to Graffs, the district court correctly denied relief on Burnett's counterclaim.

The judgments of the district court are affirmed.

AFFIRMED.

KRIVOSHA, C.J., not participating.